### MISSOURI STATE LIFE INS. CO. v. WOODSON et al.   (No. 8900.)*

(Court of Civil Appeals of Texas. Dallas. Nov. 17, 1923. Rehearing Denied Dec. 15, 1923.)

1. **Action** ⚖️38(5) — **Pleading** ⚖️64(1) — **Pleadings seeking alternative recovery held not multifarious or to constitute misjoinder.**

A petition alleging that two different insurance policies were issued and delivered to plaintiff's deceased, and describing each as a binding contract, but alleging the one to exist only in the alternative case that the evidence would establish it instead of the other, *held* not to violate rule against multifariousness or misjoinder.

2. **Appeal and error** ⚖️1050(1)—**Permitting insurer's agent to state difference between policy applied for and that sent, if error, was harmless.**

If it was error to permit defendant's agent in answer to a question to testify that there was no difference between the policy received by the agent from his principal to be delivered to deceased, and the policy deceased expressed a willingness to accept, such error was harmless, where the policy sent to the agent was in evidence before the jury, and under the undisputed evidence that policy and the one contemplated in deceased's written application sent to insurer were the same, except that a double indemnity rider would have been attached to the latter while it was omitted from the policy sent to the agent, and that the double indemnity feature was not incorporated in the body of policies, but was expressed only in a "double indemnity rider."

3. **Evidence** ⚖️165(1), 413, 471(29) — **Evidence held properly to identify policy deceased contemplated receiving.**

Where it was conclusively shown that a double indemnity feature in a policy requested

---

*Writ of error dismissed for want of jurisdiction February 6, 1924.

in deceased's written application would be embodied in a rider merely attached to the policy, testimony descriptive of the rider, together with identification of the policy as being otherwise the same as that in the record which was the one sent to insurer's agent, properly identified the policy contemplated in deceased's application, where the policy with the double indemnity could not be offered in evidence because it was not made up.

**4. Appeal and error ⟨Key⟩1053(5)—Admitting evidence of notices mailed to insured after insurer's denial of liability, if error, was harmless.**

Conceding that it was error in receiving, over defendant insurer's objection, evidence of notices sent by insurer's agent to insurer with reference to a 20-payment policy, after insurer's denial of liability under that policy, such error was harmless, where no question of liability on that policy was submitted to the jury.

**5. Insurance ⟨Key⟩88, 129—Powers of general agent stated.**

Where D. was defendant's general agent, he possessed authority to do all the acts connected with the business of soliciting insurance, and taking applications therefor and within the actual or apparent scope of that authority, his acts, omissions, representations, promises, and agreements with insured as to the kind of policy the latter proposed to apply for were those of the insurer.

**6. Insurance ⟨Key⟩95—Agent's knowledge of insured's intentions held imputable to insurer.**

Knowledge of insurer's agent of deceased's intentions and understanding with the agent expressed in negotiations attending the application for a policy held imputable to insurer.

**7. Insurance ⟨Key⟩95—Knowledge of insurer's agent of conditions under which deceased purchased policy held imputable to insurer.**

Where deceased's proposition to defendant's authorized agent was for a policy without double indemnity if the company should issue it after declining one with double indemnity, that proposition was made to the agent's company, notwithstanding the agent failed to embrace it in the written application, because he thought it was unnecessary to do so, so that, when the policy without the double indemnity was issued, the imputation prevailed that the company then knew that the proposition made by deceased applied to the policy issued.

**8. Insurance ⟨Key⟩136(2)—Possession of policy by insurer's agent held equivalent to actual delivery to insured.**

Though an insurance agent cannot act for both parties in making a contract, after stipulations in the negotiations involving the making and acceptance of an offer are passed, the agent may retain possession of the policy as custodian of the insured, and his possession under such circumstances is tantamount to actual delivery of the policy to insured.

**9. Insurance ⟨Key⟩665(2)—Insurer's agent receiving policy held it as custodian of insured.**

Evidence *held* to show that the policy received by insurer's agent was held by him as custodian of insured.

**10. Insurance ⟨Key⟩665(2) — Evidence held to show acceptance and delivery of policy to insurer.**

Where deceased's application to insurer's agent was a proposition for the precise policy issued and delivered to the agent by his principal, evidence *held* to show an acceptance of insured's offer and delivery of the policy to him.

**11. Insurance ⟨Key⟩91—Insurer led by agent to believe application was sufficient held not bound by undisclosed limitations and instructions to agent.**

Where insured was led to believe by insurer's agent that insured's application sufficed for the policy requested and sent to the agent, insured could not be bound by undisclosed limitations and instructions imposed by insurer upon its agent, where insured knew nothing of those limitations and instructions.

**12. Insurance ⟨Key⟩141(1)—Insurer held estopped from denying liability on policy.**

Where delivery of a policy to insurer's agent made the agent insured's custodian, but actual manual delivery of the policy was defeated by agent's neglect to execute private instructions given him, of which insured had no knowledge, both with reference to the application for and the delivery of the policy, insurer was estopped to deny liability.

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by Anna B. Woodson and others against the Missouri State Life Insurance Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Phillips, Townsend & Porter, of Dallas, for appellant.

Cockrell, McBride & O'Donnell, of Dallas, for appellees.

HAMILTON, J. In August, 1918, James M. Woodson, Jr., applied for a 10-pay life insurance policy in the Missouri State Life Insurance Company, the amount of the policy applied for being $12,500. The application was taken by J. F. Duncan, appellant's general agent. Duncan went to a farm near Plainview on August 2, 1918, accompanied by A. G. Hemphill, for the purpose of discussing a life insurance transaction with some person other than Woodson. While Duncan and Hemphill were discussing insurance with the party whom they had called upon for that purpose, Woodson came up in an automobile on his way to a nearby irrigation pump station. Duncan engaged him in a conversation concerning life insurance, and the discussion resulted in Woodson's signing an application, which contained

a request for double indemnity in case of accidental death. The transaction was had in the presence and hearing of Hemphill, and he and Duncan were the only witnesses who testified concerning it below. The evidence given by each substantially corroborated that of the other in most material respects. The application was filled out by Duncan, the general agent, on a blank form of application supplied for the purpose of the company. The application contained a printed clause as follows: "I hereby request ——— (this space is for special request, such as preliminary insurance, issuance of separate policies, etc.)." In the blank space immediately following the word "request" in this sentence were inserted the words "issue double indemnity rider." The form, which was that usually and generally provided and used for all applications, was signed by Woodson. He executed his notes for the first premium on a policy with the double indemnity rider attached, and delivered them to Duncan when the latter took his application. Duncan had authority from appellant to accept such notes upon his own responsibility. The application was forwarded to the company, and the premium notes also passed into its hands. Woodson stood the required medical examination, and it was satisfactory to the company.

At the time Duncan forwarded the application to appellant he wrote appellant a letter, requesting that it send along with the 10-pay policy a 20-pay policy also, and advising that one or the other of them would be delivered to Woodson. Woodson had not applied for any policy except the 10-pay policy, and the 20-pay policy had not been mentioned in the transaction with Woodson, who did not then know that Duncan had requested that both policies be forwarded. When the application was received, a 10-pay policy without the double indemnity rider attached to it and a 20-pay policy without such rider were made up, and mailed to the agent at Plainview. Each policy thus mailed was accompanied by a new application filled out in duplicate. The terms of that for the 10-pay policy were precisely the same as those contained in the original application signed by Woodson, except that the words "issue double indemnity rider" were not inserted as they were in the original application, and the stated premium was less. The application for the 20-pay policy which accompanied it was also the same as that signed by Woodson when he made application for the insurance, except as to the statement of the kind of policy and the amount of premium. When appellant mailed these policies with the accompanying applications to Duncan, it also sent him, over its assistant secretary's signature, the following letter:

"August 16, 1918.

"Mr. J. F. Duncan, Jr., General Agent, Plainview, Tex. Dear Sir: We inclose herewith policies Nos. 184523 and 184524 on the life of James M. Woodson, Jr. These policies have been issued as alternatives, and only one of them is to be delivered. The other is to be returned to this office for cancellation. Before delivery of either of these policies, kindly have the attached new applications properly signed and witnessed, and return to us. There are copies of these new applications attached to the policies which should also be properly signed and witnessed. The additional insurance requested in your letter of the 2d inst. you requested a 20-pay life with guaranteed paid-up additions, and, in accordance with our war bulletin, you will note we cannot issue that kind of policy on account of applicant's being in the draft age. Therefore we are issuing this policy as a 20-pay life annual dividend.

"Yours very truly,
"[Signed]  W. M. Donnelly,
"Assistant Secretary."

Duncan never spoke to Woodson about any policy other than the 10-pay life, the kind for which he made application, until several days after he had taken his medical examination pursuant to obtaining the policy under the application he made as above stated. Several days subsequent to that event, Woodson was in Plainview, and met Duncan. At that time Woodson indicated to Duncan that he was contemplating leaving that vicinity and removing to Arizona. He stated that he did not know just when he would leave, but that it would be soon, and that he did not know definitely where he would go. Duncan told Woodson that he wanted to have a talk with him, and invited him to his office. Hemphill, it seems, was present at the time Duncan requested Woodson to go to the office with him for the purpose of a conversation, and the three went together. Upon arriving at the office Duncan disclosed to Woodson for the first time that he had taken the liberty of ordering an alternate policy, the 20-pay policy, and entered into an elaborate discussion of its merits for the purpose of persuading Woodson to accept it instead of the 10-pay for which he had made application. It appears from Duncan's testimony that the controlling reason which prompted him to make the request to his company for the alternate policy, and which also prompted him to attempt to induce Woodson to accept it, was that he could realize for his commission a greater per cent. of the first premium, and perhaps render the payment of premiums easier on Woodson. While in his office he and Woodson together examined a specimen policy containing the 20-pay plan which he was attempting to sell to Woodson. After a lengthy discussion of the 20-pay life policy, Woodson stated that he would go over it when it came, if it arrived before he left Plainview, and that, if, after he had examined it, he liked it better than the 10-pay policy for which he had made application, he would accept it instead of the 10-pay policy, which Duncan, the gen-

eral agent, advised him he could send back for cancellation if he decided to take the 20-pay. Following this event, it seems that no further conversations of any importance ever took place between Duncan and Woodson until the day of the latter's departure arrived, although Duncan had seen Woodson two or three times in the interim between the date of taking the application and that day. In the morning of that particular day Woodson, contemplating leaving in the afternoon, it seems, called on Duncan to inquire if the policy for which he had made application had been received by Duncan. In response to this inquiry he and Duncan, again accompanied by Hemphill, the Midland Life agent, went to the post office to ascertain if the policy had arrived. It appears that Hemphill had also written Woodson a policy in the Midland Life, and Woodson was inquiring as to whether this policy had arrived as well as that in the Missouri State Life. Finding that neither one of the policies had arrived, he stated to Duncan that he did not know where he was going to be, but that he would be somewhere in Arizona, and requested Duncan to hold for him the policy for which he had applied in the Missouri State Life as well as that for which he had applied in the Midland Life until he sent his address, at which time Duncan should forward them to him. Duncan's testimony in this connection was as follows:

"He (Woodson) was inquiring about his policies, not only in the Missouri State but the other from the Midland Life, and neither one of them had arrived. He did not know where he was going to be; he said he didn't know where he would be, he thought he would be somewhere in Arizona, and when the policies came to hold them until he sent his address and then forward them to him."

At that time Duncan told him that he was going to forward the 20-pay policy for Woodson's inspection. Woodson agreed that he could do so. In this same conversation, according to Hemphill's testimony, Duncan was endeavoring to induce Woodson to accept the 20-pay policy, and, according to Hemphill's testimony, Woodson, in the course of the discussion, inquired of Duncan about his 10-pay policy, and asked when it would be effective. Duncan replied that it would not be effective until it was issued by the company. To this Woodson responded, advising Duncan that he was leaving Plainview the following day, and requesting Duncan to hold the policy for him until he was located and had notified Duncan of his post office address. Duncan agreed to hold the policy for Woodson until the latter advised him where to send it.

Hemphill further testified that Duncan assured Woodson that the 10-pay policy would be effective when issued by the company, and that "that was the purpose of getting his permission to hold it for him. * * *" After the 10-pay policy and the 20-pay policy were received by Duncan, together with the respectively attached applications which the company advised Duncan to have Woodson sign in the case of whichever policy Duncan delivered to him, Woodson sent Duncan a postal card giving his address as Miami, Ariz. To the address thus given Duncan mailed the 20-pay policy, accompanied by a letter with reference to it, and advising Woodson that he had given him credit on one of his notes for the difference between the premium on this policy and the total amount of the notes. The 10-pay policy itself was not mentioned in this letter, nor did Duncan in any way refer to having received it. A few days after receiving the 20-pay policy and the letter from Duncan which accompanied it, Woodson mailed to Duncan the following letter:

"Miami, Ariz., Oct. 4, 1918.

"Dear Jim: Policy received this afternoon. Now, before I sign up anything, I want said policy to be understood by us both. $390.88 is full amount that I pay company each year on 16th day of August. Correct. There is no double indemnity with this policy as to [far as] I can see, and why is that, and can I have double indemnity with said policy?

"Heard from my father in regards to my insurance with Southwestern Company, and it's in his name, which he took out on his life when I became 21 years old. So correct that with your company. My mistake, but that's the way I understood Dad when he said he took out more insurance for me. Hoping to hear from you as early as possible in regard to this matter. At first it was 10-year policy, then 15, and received a 20-year policy. Have you any 50-year policies? What's the trouble with old man Hemphill. Wishing yo health and happiness from,
"[Signed] J. M. Woodson, Jr."

In response to the above-copied letter Duncan wrote to Woodson, under date of October 21, 1918, and this letter was returned to him undelivered. Woodson died with influenza October 27, 1918, without ever having been advised that the 10-pay policy had been received by Duncan, and without any knowledge that the company had requested Duncan to obtain his signature to the new application which accompanied it. When Duncan learned of Woodson's death, he mailed the 10-pay policy to the company for cancellation and the company tendered the notes to the beneficiary named in the policy, who is the plaintiff in this case. She declined to receive them, returned them to the company, and tendered payment of them, which the company declined to accept.

When the application for the 10-pay policy was made by Woodson, he stated to Duncan, the general agent, that he desired a policy with the double indemnity feature, but that, if appellant would not issue it, he would accept the policy without it. He was slight-

ly lame in one limb. His lameness was noticed by Duncan in the course of the transaction in which the latter obtained the application. Duncan inquired as to the cause of the lameness, and Woodson informed him that it was caused by infantile paralysis. Duncan explained to him that on account of this circumstance appellant probably would not issue to him a policy with a double indemnity rider attached to it, and it was in that connection and in response to that suggestion made by Duncan that Woodson stated to him a 10-pay policy without the double indemnity rider would be acceptable to him.

Hemphill testified that, after Duncan explained to Woodson that appellant company probably would not issue the policy with the double indemnity feature attached, and had discussed the matter with Woodson, praising his company, and telling him how proud he should be to get this policy, Woodson finally said, "Well, I will take the policy with the company if it comes without the double indemnity." Duncan testified, in effect, that Woodson told him he would accept the policy without double indemnity.

Duncan testified that he held the 10-pay policy on his desk after he received it until November 4, 1918, when he returned it to the company, and that he was holding it for Woodson. He also testified that there was no difference between the 10-pay policy Woodson told him he would accept at the time he gave his application and the 10-pay policy received by Duncan from the appellant. Duncan testified that both he and Woodson considered that the latter had bought the 10-pay policy, and that he, Duncan, was holding it for him with the understanding that in the event Woodson decided to accept the 20-pay policy which Duncan was endeavoring to deliver to him, after inspection, the 10-pay policy would be canceled. Duncan testified that, while Woodson stated he would accept the 10-pay policy without the double indemnity feature, he did not indicate this in the application sent to the company, because it was unnecessary to do so. The foregoing comprehends the essential elements of the facts necessary to be stated as a basis for the conclusion this court expresses as to their legal consequence.

Proof of claim having been made by appellee, the beneficiary in the 10-pay policy, as well as in the 20-pay policy which the agent sought to deliver to Jas. M. Woodson, Jr., and appellant having declined to receive the proofs of claim or recognize any liability, and having refused to accept payment of the premium tendered by appellee, appellee filed suit, pleading that appellant had executed and delivered to Jas. M. Woodson, Jr., on August 16, 1918, the 10-pay policy hereinabove mentioned, whereby Jas. M. Woodson, Jr.'s, life was insured in the sum of $12,500, payable upon his death to appel-

lee as beneficiary. It was alleged that, if the plaintiff (appellee) should be mistaken in this allegation, then, on the same date, appellant executed and delivered to Jas. M. Woodson, Jr., the 20-pay policy above mentioned, by the terms of which it insured his life in said sum of $12,500, payable upon his death to appellee as beneficiary. All other allegations essential to recovery upon the allegations with reference to either of the described policies were set forth in the petition.

Among other defenses appellant pleaded that each of the policies recited that it was issued in consideration of a written application, copy of which was attached, and that the policy in each instance expressly provided that it and such written application constituted the entire contract; and it was alleged that, since neither of the written applications sent with the policies was signed by Woodson, who expressly refused to sign either one and accept the policy tendered, there was never any agreement between him and appellant. In response to this feature of the answer appellee pleaded estoppel, based upon the facts above set out with reference to the transactions between Woodson and Duncan.

The case was submitted to a jury upon special issues. The issues and their respective answers are as follows:

"(1) Did J. M. Woodson, Jr., tell Duncan, the general agent of the defendant company, at or subsequent to the time he made application through him for a 10-pay life policy in the defendant company, and requested that same be issued with the double indemnity feature, that, if the defendant company would not issue said 10-pay life policy with such double indemnity feature as requested, he, Woodson, was willing to accept a 10-pay life policy without such double indemnity feature? Answer yes or no. Answer: Yes.

"(2) When Duncan received from the defendant company the 10-pay life policy without the double indemnity feature, did he retain and hold same for Woodson pursuant to an agreement between himself and Woodson that he would keep the same for Woodson, awaiting information from Woodson as to where to send it? Answer yes or no. Answer: Yes.

"(3) What is the amount, if any, of a reasonable attorneys' fee to the plaintiff for the prosecution of this suit? Answer: $2,500."

[1] By special exception appellant demurred to the petition, on the ground that its allegations disclosed a misjoinder of causes of action, and that the allegations constitute an assertion of right of recovery upon two separate and independent contracts of insurance inconsistent with and repugnant to each other. The exception of which the above constitutes the substance having been overruled, the action of the court in this respect is complained of, and it is contended by appellant that, this asserted frailty in the pleading having been challenged by the

special exception, the court should have required appellees to select which of the alleged causes of action they would prosecute in conformity with the prayer of the particular pleading comprising the above designated special exception.

We do not think the petition is subject to the criticism thus brought forward and presented to us. It is not a pleading which invokes a right of recovery upon two causes of action. On the contrary, it embraces only allegations looking to an alternative recovery in the event the facts to be adduced upon the trial sustain the allegations as to the second alleged contract rather than that alleged in the first place. The pleading, as we view it, does not comprise two separate and independent suits, but only allegations to the effect that, if the particular set of facts to be proffered failed to maintain the one, then, in such event, they would support the other. A right to recover only upon one contract is disclosed in the pleading. The petition is not so framed as to permit of a recovery upon both of the alleged contracts. Accordingly, while the suit alleges that two different insurance policies were issued and delivered, each of which is described as a binding contract, the one is alleged to exist only in the alternative case that the evidence will establish it instead of the other. Such being the case, we do not think it violates any rule against multifariousness or misjoinder. Compton v. Ashley (Tex. Civ. App.) 28 S. W. 223; Floyd v. Patterson, 72 Tex. 207, 10 S. W. 526, 13 Am. St. Rep. 787.

[2, 3] The agent Duncan, whose deposition was taken by appellees, was asked by deposition the following question:

"Please explain in detail the difference, if any, the features between the 10-year pay policy said Woodson told you he would accept at the time he gave you his application and the 10-year pay policy received by you from said Missouri State Life Insurance Company on his life. Did or not said 10-year pay policy received by you for him contain the features said Woodson stated to you he would accept?"

To which question the witness answered in these words:

"No difference."

Appellant made objection to the admission of the answer, on the ground that it merey embodied a conclusion and opinion of the witness, and that, since the policies were in writing, they, themselves, would be the best evidence of their own contents, and that the testimony tended to vary and contradict the terms of written instruments. The objection was overruled, and this action is assigned as error, and the assignment is made the basis of a proposition presenting complaint against the admission of the deposition for the reasons assigned as above indicated.

If there was any error in the ruling complained of, it would not, considered in connection with the whole record, justify disturbing the judgment. The policy itself was admitted in evidence, and was before the jury for its inspection. Under the undisputed evidence the policy which was sent to Duncan for delivery, and that which was contemplated in the written application sent to the company, were precisely the same, except that to the latter would have been attached the double indemnity rider, while it was omitted from the former. Duncan's testimony that there was no difference between the policy Woodson told him he would accept at the time he gave his application and that which was sent in response to the application for delivery by the agent is but a statement that the 10-pay policy applied for was in terms the same as that in evidence. According to Duncan's testimony, which was not controverted, the double indemnity feature was not incorporated in the body of the policies which were issued carrying this feature, but it was expressed only in what is termed a "double indemnity rider." The record as a whole conclusively shows, independent of this answer, that the only difference between a policy providing for double indemnity insurance in case of accidents and a policy without this feature was that the double indemnity provision was contained in a rider attached to the ordinary 10-pay life policy issued by the company, which, as above stated, was before the jury. Even if it be conceded in this connection that the policy applied for was only one with the double indemnity, still there is no suggestion that there was in fact any other difference between the policies, and, it being conclusively shown that the double indemnity feature requested in the written application would be embodied in a rider merely attached to the policy, testimony descriptive of the rider, together with identification of the policy as being otherwise the same as that in the record, properly identified that contemplated in the application. The policy with the double indemnity could not be offered in evidence, because it was not made up. No harm appears to have been done appellant to justify a reversal of the case upon the ground assigned in this connection, and the assignment is overruled.

[4] Error is assigned, because the court admitted in evidence, over objection duly made by appellant, certain printed notices which seem to have been mailed by it to Jas. M. Woodson, Jr. The ground of this complaint is that there was no evidence that these notices were mailed by appellant, or with its knowledge and consent, and that they appeared, under the proof, to have been received long after it had denied liability under the policies sued upon. The evidence discloses that the notices related to the 20-pay policy mailed by Duncan to Woodson

at Miami, Ariz., for his inspection, and no question of liability under this policy was submitted to the jury. Accordingly, if it be conceded that error was committed in the admission of the evidence, then it clearly appears to have been harmless.

What we have said above with reference to assignments of error attacking the pleadings and the admission of evidence disposes of every feature of the appeal necessary to be specifically noticed, except the comprehensive proposition that judgment was improperly entered against appellant, because the evidence conclusively establishes that no completed contract between appellant and Woodson was ever effected upon which to predicate liability. Various propositions are presented by appellant in support of this legal conclusion, all of which propositions are so related each to the other that separate discussions of them are not required, and they will be disposed of by our statement of our view as to whether or not the evidence as a whole is susceptible of sustaining the conclusion that Woodson embodied in his proposition made to the general agent at the time the application was obtained, of which the subsequent acts of appellant and Duncan in connection with the transaction can be said to constitute a complete acceptance.

The evidence supports the conclusion that the facts were as expressed in the following statement: Woodson applied for a 10-pay policy without a double indemnity feature, subject to the company refusing to issue it with this feature. The agent, without any fault of Woodson's failed to disclose this proposition to the company, because he regarded it as unnecessary. The company, declining to issue a policy with the double indemnity feature, as Duncan's explanation to Woodson was calculated to cause him to expect, issued one without it, and placed it in the agent's hands for delivery to Woodson, with the request that the agent have Woodson sign another application which accompanied it, embodying the precise alternative proposition already made by him and met in the policy issued, although such proposition was not disclosed to the home office by the agent. Duncan regarded himself as custodian of the policy for Woodson, holding it for him while endeavoring to substitute for it the 20-pay policy. Woodson had specifically requested Duncan to retain custody of it for him, and Duncan had agreed to comply with the request. Woodson was never advised that his signature to the new application was desired, and, as stated, it was but a copy of that which he had already signed, except that the double indemnity request was omitted from it.

[5-7] Duncan being a general agent, possessed the authority to do all the acts connected with the business of soliciting insurance and taking applications therefor (second C. J. 427; Joyce on Insurance, § 472),

and, within the actual or apparent scope of that authority, his acts, omissions, representations, promises, and agreements with Woodson as to the kind of policy the latter proposed to apply for were those of his principal. His knowledge of Woodson's intention and understanding with him expressed in the negotiations attending the application is to be imputed to appellant. According to the evidence, Woodson's proposition to Duncan was for a policy without double indemnity, if the company should issue it after declining one with such double indemnity. This proposition when made to Duncan as appellant's agent for the purpose of obtaining insurance was made to appellant, regardless of the fact that Duncan failed to embrace it in the written application, because he thought it unnecessary to do so. So, when the policy recovered upon was issued, the imputation must obtain that appellant then knew the proposition made by Woodson to Duncan applied to this policy. Ins. Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87, 33 L. Ed. 341; Kelly v. Troy Fire Ins. Co., 3 Wis. 254; Smith v. Ins. Co., 89 Pa. 287; Biddle on Insurance, § 1063; Joyce on Insurance, § 427; May on Insurance, § 144g.

[8, 9] After receipt of the policy by the agent, he, under the facts, held it as custodian for Woodson, his possession being equivalent as a matter of law to possession by Woodson under actual manual delivery of it to him, unless the instruction given the agent to obtain Woodson's signature to the applications which accompanied the policy before making delivery so qualified Duncan's possession as to render his custody a holding for the company instead of for Woodson, subject to the latter's signing the new application as an acceptance of a counter proposition. Under the authorities which we think should be applied as controlling, we are of the opinion that Duncan must be regarded as the custodian of the policy for the insured. Although an insurance agent cannot act for both parties in making the contract of insurance, still, after those stages in the negotiations involving the making and acceptance of an offer are passed, the agent may retain possession of the policy as custodian of the insured, and his possession of it under such circumstances is tantamount, in its binding effect, to actual delivery of the policy to the insured.

[10, 11] Since Woodson's proposition made to Duncan comprehended an offer to accept the very policy forwarded to Duncan, and as his conduct and assurance, which were within the general scope of his authority in the matter, were those of appellant, we think it must be held that the issuance and delivery of the policy to Duncan was an acceptance of Woodson's proposition under the circumstances, rather than a counter proposition

depending for acceptance upon Woodson's signing another application. The old application was a proposition made to appellant for the precise policy issued and delivered to Duncan, and, under the facts of the case, when the policy was issued and forwarded to Duncan, there was an acceptance of the offer and a delivery of the policy to the insured. At most, the requirement made of the agent to have Woodson sign the new applications was formal rather than substantial. He had already met all the requirements necessary to satisfy appellant to assume the risk. He had given all desired information, delivered acceptable premium notes, passed the examination, and was in good health at the time the policy came into Duncan's possession. Woodson was led to believe by Duncan that the application signed by him sufficed for the purposes of this very policy, and he could not be bound by undisclosed limitations and instructions imposed by appellant upon its agent, of which limitations and instructions he knew nothing. An abundance of time was available to Duncan within which to make actual delivery of the policy to Woodson and inform him of appellant's desire to have him sign the new applications, but, instead of doing this, Duncan withheld all information from Woodson as to the arrival of the policy with the new application to be signed while he undertook to make delivery of the 20-pay policy.

On appellant's contention that the policy did not go into effect and become a binding contract because the new application forwarded to Duncan was never signed by Woodson, we regard the case of Amarillo National Life Ins. Co. v. Brown, as particularly upon the point. In that case application for a certain kind of policy was made and signed by the insured. Upon receipt of the application, the general office, after investigation of the risk, declined to issue the particular kind of policy applied for but did issue and forward to the general agent, who took the application, a policy covering a shorter period of premium payments, and requiring greater annual payments. This policy was held several days in the office of the agent, who lived a great distance from the insured's place of residence. Finally, by telephone, the agent communicated with the insured, and explained to him that the policy applied for had been refused by the company, and that that which had been sent to the agent had been substituted for that applied for, and the matter was explained

to the insured by the agent in the telephone conversation. The insured replied in response to the agent's explanation of the change that it was all right, and he requested the agent to keep the policy for him until he came for it, stating that he would pay the additional premium when he called for the policy. Thereupon the agent deposited the policy with his private papers in a bank. The policy sent out was accompanied by a new application to be signed as in the instant case. The insured died without ever having signed the application, and without ever having the substituted policy in his possession. The application signed in that case embodied a provision to the effect that no statement made by or to any person should bind the company or affect its rights, unless such statement was written into the application. The policy issued in that case contained a provision to the effect that the policy and applications should constitute the entire contract, which could not be waived or altered in any respect, except by the written agreement of the company signed by the president or secretary, whose authority for such purpose could not be delegated. In a very able opinion by the Court of Civil Appeals at Amarillo it was held that under these circumstances the insurance company was estopped to assert that the policy was not effective on the ground that no application for it was signed by the insured. Amarillo National Life Ins. Co. v. Brown, 166 S. W. 658 (writ of error denied by the Supreme Court).

The views above expressed also find support in the following authorities: Kimbro v. Life Ins. Co., 134 Iowa, 84, 108 N. W. 1025, 12 L. R. A. (N. S.) 421; Unterharnscheidt v. Life Ins. Co., 160 Iowa, 223, 138 N. W. 459, 45 L. R. A. (N. S.) 743; Life Ins. Co. v. Babcock, 104 Ga. 67, 30 S. E. 273, 42 L. R. A. 88, 69 Am. St. Rep. 134.

[12] The record as a whole disclosing that delivery to the agent made him Woodson's custodian, and that actual manual delivery of the policy to the insured was defeated by the neglect and omission of the agent to execute private instructions given him, of which the insured had no knowledge, both with reference to the application for and the delivery of the policy, we are of the opinion that appellant is now estopped to deny liability. The findings of the jury being sustained by the record, the judgment of the court below ought not to be disturbed. Accordingly, it is affirmed.

Affirmed.