**SHARPSTOWN STATE BANK, Appellant,**

v.

**GREAT AMERICAN INSURANCE COMPANY et al., Appellees.**

No. 11664.

Court of Civil Appeals of Texas.

Austin.

April 9, 1969.

Rehearing Denied May 7, 1969.

Second Rehearing Denied May 28, 1969.

See also Tex.Civ.App., 422 S.W.2d 787.

Kendall, Koch, Randle, Finch & Osborn, Gaynor Kendall, Austin, for appellant.

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Thomas G. Gee, Austin, Barrow, Bland & Rehmet, David Bland, Houston, for appellees.

PHILLIPS, Chief Justice.

This suit was brought in the court below by Appellant Sharpstown State Bank against Appellee Great American Insurance Company; Commercial Investment Fund, Inc., a Nevada Corporation; William Nathan, an individual Texas resident; and Mayfair Investment Company, a Texas Corporation.

Appellant sought judgment against the respective signatories upon a $300,000 promissory note due December 7, 1967, payable to Appellant's order, signed by Nathan and Mayfair Investment Co. as makers; a $300,000 surety bond signed by Nathan and Mayfair Investment Company as principals and in the name of Appellee Great American Insurance Company, as surety, by Curtis J. Bohannon as its attorney-in-fact, securing Appellant as obligee and conditioned to assure payment of the abovementioned note when due; a promissory note for $170,000 due December 7, 1967, payable to Appellant's order, signed by Commercial Investment Fund, Inc. and Nathan as makers; a $170,000 surety bond signed by Commercial Investment Fund, Inc. and by Nathan as principals, and by Curtis J. Bohannon in the name of and as attorney-in-fact of Great American Insurance Company, as surety, securing Appellant as obligee, and conditioned to assure the payment of the $170,000 note when due.

Oak Forest Bank, of Houston, and the Homestead Bank, of Houston, alleging the assignment to them of certain undivided participation interests in the notes and bonds, intervened. Upon their subsequent motions and upon their representation that Appellant had purchased their respective interests in the notes and bonds, Oak Forest Bank and Homestead Bank were dismissed as parties.

The trial court entered an interlocutory pretrial order granting Appellant's motion for partial summary judgment against Nathan and Mayfair Investment Company on the $300,000 note and interest, and against Nathan and Commercial Investment Fund, Inc. on the $170,000 note and interest, and ordered that Nathan and Mayfair Investment Company take nothing by their cross-actions against Appellant and Oak Forest.

Appellee Great American having denied under oath that the bonds were executed by it or by its authority, the case went to trial before a jury on the issues not disposed of by the pre-trial order.

At the conclusion of the evidence, Appellant moved for instructed verdict which was denied, and thereupon, the Court submitted certain special issues to the jury.

Special Issue 1 inquired whether "J. Curtis Bohannon had apparent authority from Great American Insurance Company to sign the bonds" to which the jury answered "No." Special Issue No. 2 asked whether Curtis J. Bohannon "signed such bonds" to which the jury answered "Yes." In Special Issue 4, inquiring whether Gilbert Bartling, Jr., "had apparent authority from Great

American Insurance Company to deliver such bonds to plaintiff bank in Houston" the jury answered "No."

Other special issues in the charge, conditioned upon affirmative answers to Special Issues 1 and 4 were unanswered.

Appellant moved the Court to disregard the answers to the jury to Special Issues 1 and 4 and to enter judgment for Appellant, not only against the makers of the notes and the principals on the bonds, but against Great American Insurance Company as surety on the bonds.

The Court in the course of its final judgment "being of the opinion that the jury's answer to Special Issue No. 1 is without any evidence to support it, and that the uncontroverted evidence established as a matter of law the apparent authority of Curtis J. Bohannon to execute the bonds in suit as agent for defendant Great American Insurance Company" ordered that the answer of the jury to Special Issue No. 1 be disregarded but otherwise denied the motion insofar as granting relief to Appellant against Great American was concerned.

The Court thereupon entered final judgment that Appellant recover from defendants William Nathan and Mayfair Investment Company by reason of the bond and note signed by them, the principal sum of $300,000 together with interest thereon and attorney's fees in the amounts stipulated at trial; that Appellant recover from defendants Nathan and Commercial Investment Fund, Inc. by reason of the bond and note signed by them, the principal sum of $170,000 with interest and stipulated attorney's fees. By reason of the jury's finding to Special Issue 4, the Court ruled that Appellant take nothing as against Appellee Great American.

The Court further adjudged that Nathan and Mayfair Investment Company take nothing by their cross-actions against Appellant and Oak Forest Bank. Nathan and Mayfair gave notice of appeal but subsequently were allowed to withdraw this notice.

Appellant has perfected its appeal from this judgment.

We hold that that portion of the judgment of the trial court that Appellant take nothing is reversed and rendered as hereinafter indicated.

I.

Appellant is before us on six points of error.[1] However, inasmuch as we sustain

1. "POINT II: In the alternative, the judgment should be reversed and the cause remanded because the answer of the jury to Special Issue 4, on which the take-nothing judgment rests, is contrary to the overwhelming weight and preponderance of the evidence; POINT III: The District Court erred in permitting Great American to introduce the deposition testimony of the witness Lane that as Deputy Banking Commissioner he had in a February, 1967 report to the Commissioner expressed the opinion that 'the bank management had not sufficiently checked the collateral' (i. e., the bonds) and 'was lax in handling these credits,' over objection that the opinion was inadmissible because: (a) the witness had testified he had no personal knowledge of any facts regarding the transaction, and no facts assumed as basis for the opinion were either stated by the witness or hypothetically by counsel; and (b) the opinion was not that of the witness at time of testifying; POINT IV: It first having been established that Great American had furnished its agent Bohannon with a written power of attorney intended to be shown to third persons as proof of the agent's appointment and of his authority to execute on behalf of Great American, 'as surety, any and all bonds, undertakings and contracts of suretyship,' and that the power of attorney was shown to the officers of the plaintiff, who believed it, and relied and acted on it by accepting the bonds signed by Bohannon as security for loans plaintiff otherwise would not have made, the District Court erred in allowing Great American to prove that by private oral and written instructions, of which plaintiff was unaware, Bohannon was forbidden actual authority to execute bonds of the type in suit; POINT V: In view of the testimony of Great American's

point I it will not be necessary for us to discuss the remaining points.

Appellant's point I is that the judgment should be reversed for Appellant against Great American as surety on the bonds, because the apparent authority of Great American's agent Bohannon to execute, and of its agent Bartling to deliver the bonds was established as a matter of law by the uncontroverted evidence.

We sustain this point.

The preliminary details of this case are quite extensive and protracted involving a great amount of financial maneuvering on the part of quite a few people. Due to the position we take it is our opinion that to state these details here would be of little avail or shed little light on whether or not Great American's Bohannon had the authority to execute the bonds in question and whether or not Bartling had the authority to deliver the bonds.

The pertinent facts necessary to our decision are as follows: Frank Sharp, the owner of the controlling interest in Appellant Bank, the abovementioned William Nathan and one Lee G. Wiley entered into either a partnership or a joint venture, the exact legal nature of which is immaterial here, wherein it was arranged that Wiley would borrow $300,000 from the Central National Bank in Houston on his personal note due in six months. It was then arranged for Appellant Bank to give Central National a take-out commitment that if the note was unpaid at maturity Appellant Bank would make Wiley a loan of $100,000 on the due date and Oak Forest Bank (in which Sharp was also a majority stockholder and Chairman of the Board) similarly agreed to make Wiley a loan of $200,000. More-over, Appellant and Oak Forest Bank each agreed to maintain a deposit with Central National Bank equal to the face amount of the loan during the loan interval.

Nathan then proceeded to buy options to purchase certain stock in a California corporation by the name of California Financial Corporation. Sometime later, Sharp informed Nathan and Wiley that he wanted to get out of their arrangement concerning California Financial Corporation; that if they desired to proceed and could find someone else to carry it with them, or if they could sell the deal, it would be agreeable with him, but that "he wanted out."

Wiley then began seeking a buyer for their California Financial Corporation "position" in and around Houston with one or more prospects indicating interest. Nathan then went back to California seeking either a new partner or a sale of the transaction. Finally, Nathan agreed with the Commercial Investment Fund of Los Angeles to purchase the abovedescribed transaction.

According to Nathan's testimony, Commercial Investment Fund was to acquire the transaction held in the name of Nathan and Mayfair Investment Company, was to relieve Nathan and Mayfair of, or replace them on, the various stock-purchase contracts among other arrangements not pertinent here. Nathan returned to Houston and described this proposal with an officer of Central National Bank and with Charles McLean, president of Appellant Bank. Nathan told both of these bank officials that Commercial Investment Fund had indicated that they could provide a bond, a performance bond covering the payment of their indebtedness from a major insurance

witnesses and the arguments of its counsel that Agent Bartling was limited to the State of Kansas in his authority to act for the company, and that his presence in Texas to deliver a bond should of itself have caused a reasonably prudent person to make further inquiry, the denial by the District Court of plaintiff's motion for new trial based upon newly-discovered evidence that Bartling had actual authority from Great American to deliver bonds in Texas, was an abuse of the Court's discretion for which the judgment should be reversed; POINT VI: The answer of the jury to Special Issue No. 1 is likewise against the overwhelming weight and preponderance of the evidence."

source that would be rated no less than A plus 5–A in the insurance guide or manual.

McLean testified that at the time of the October discussions he had known that Nathan and Wiley had taken some position in California Financial Corporation stock, and had heard rumors that Sharp possibly had some personal interest in their deal; but he did not know any details of transaction, and did not know at the time and still did not know whether Sharp had had any personal interest in it. He, of course, knew of the bank's take-out commitment of the Wiley note and of its agreement to maintain a $300,000 compensating deposit with Central National.

Against this background, McLean heard Nathan's outline of a proposed $470,000 loan with Commercial of Los Angeles, as the borrower, or one of the borrowers; Nathan represented that the loan would be secured by a bond issued by an "A plus 5–A rated insurance company;" and that the borrowers proposed to use the proceeds to acquire and take over the stock position which Nathan and Mayfair held in the California Financial Corporation stock. The names of the California people mentioned by Nathan meant nothing to McLean, but he was aware that the "A plus 5–A" rating mentioned as the character of insurance company proposed as surety was the highest rating given in Best's Reporting Service, and indicated an insurance company of great size, "the best company there is."

During the initial discussions, Nathan told McLean that the U. S. National Bank in San Diego, California, had closed a loan, or was closing a loan, on a similar bond, gave him the name of Robert P. Gould, a Vice President, as the man to talk to, and McLean called Mr. Gould. Gould told McLean that the San Diego bank did have a loan pending which was to be secured by such a bond, and whether Gould told him it was to be closed in Los Angeles the next day, or at a later date, he could not remember.

McLean went to Frank Sharp, the Chairman of the Board of the Bank, and outlined the Nathan proposal of a loan to Commercial, secured by a guarantee or bond issued by an insurance company, "and we decided that if such a bond was presented, that there would be no reason why we couldn't make the loan."

Around October 18th Nathan furnished McLean with a draft or specimen form of the proposed bond, with no name of the insurance company appearing, but Nathan related that the people at Commercial had told him that the bonds were obtained from companies all rated A plus 5–A. On the 19th of October McLean wrote a letter to Will Wilson, attorney for the bank, enclosing a copy of the bond specimen, and requesting him to "go over the language of this bond and advise if there are any changes that should be made to make it legal in Texas." McLean was "motivated * * * to write the letter * * * to Mr. Wilson" because McLean had never made a similar loan. He was advised by Wilson that with a minor change to show performance in Harris County, it would be all right.

Nathan also delivered to McLean a financial statement covering Commercial, showing a net worth of some $11,000,000, which was prepared by Karl A. Gertenhouse & Associates, whose letterhead represented them to be certified public accountants of Los Angeles.

McLean then requested Dun and Bradstreet for a general report and a credit report on Commercial, and was informed by telephone by Dun and Bradstreet that it could not give the requested information, because Commercial had threatened to sue them if they gave out any information about the company. He could not remember the date of this report, but because of his being unable to find out anything about Commercial from the source to which he made inquiry, he decided that he simply would not make the loan unless the performance bond was produced, as proposed.

He consequently did not make further credit inquiries, since he felt sure that before any insurance company could issue such a bond as proposed, it would have made an exhaustive check of the principals. And if an insurance company could see its way clear to issue such a bond, "we could certainly go along on making a loan based on their ability to issue that bond." In view of his decision not to make the loan unless the bond was produced, he saw no point in spending money, time and effort making a further credit investigation. He concluded that the bond probably would not be delivered.

After the October discussions, Nathan was in touch with McLean "off and on concerning the attempt to close this loan." McLean first learned the names of the people connected with Commercial when Nathan introduced them to him at the bank November 4, 1966. He met at that time a Mr. Charles Luftig, a Daniel Predovich, and a third man whose name he did not remember. He did not ask them why they would not let Dun and Bradstreet give out information about them, because he "still didn't think the bond would be delivered."

At the November 4th meeting, Luftig as president of Commercial, signed a note payable to the plaintiff for $300,000, and because he had to go on back to California, left it with McLean to be activated when the bond was delivered. Luftig also delivered signed copies of corporate resolutions of Commercial authorizing its president to borrow money and a letter from Luftig as president of Commercial, directing deposit of the loan proceeds to Mayfair account and authorizing Nathan to draw checks on the account.

Nathan thereafter called from time to time to report that the bonds would be delivered momentarily, but the bonds did not appear, which further convinced McLean that the bonds simply would not be forthcoming. Sometime during this period, McLean was called by a man named Bill Skillman who either identified himself, or was identified by Nathan, as a broker of Kansas City, Missouri, who was getting the bond issued for Commercial Investment Fund and Mayfair Investment Company. Skillman told him that the paper work on the bond was about complete, and it would be delivered soon. Then, the last day of November, or the first day or so of December, either Nathan or Skillman told McLean that the bond would be written by Great American Insurance Company, out of the Kansas City Regional Office, and this was the first time the name of the proposed surety was mentioned.

Two or three days thereafter, McLean went to his own local insurance man, who had a Best's guide, and checked to see what the rating of Great American was. McLean then called the number listed in the Houston directory for the local office of Great American, and talked to the local office manager, a man named Smith. McLean asked if Smith could furnish the names of the officers who could sign bonds in their Kansas City Regional Office, and Smith reported that he could only give the name of the Regional Manager of the Kansas City office, viz., Lynn Gregg.

Nathan then called McLean to say that arrangements had been made for delivery of the bond on December 7. McLean replied that he had to be out of town on the 7th, to attend a meeting in Dimmitt, but that he would be back on the 8th. So arrangements were made for the bond to be brought in on the 8th.

McLean returned to Houston by train on the morning of the 8th of December. He did not hear anything from Nathan until about 4:30 in the afternoon, at which time Nathan, Luftig, Predovich and two other men came to McLean's office in the bank. Nathan introduced one of the two men McLean had not previously met as Bill Skillman, the broker on the bond and with whom McLean had prior telephone conversations, and the other as Gilbert Bartling, Jr., who was presented as a general agent from Kansas City representing Great

American Insurance Company. McLean was told by Bartling that he had a general agency in Kansas City "and the company he was with—of course they had other companies, but he was agent for Great American."

Bartling had in his possession two instruments in blue covers: one consisted of the $170,000 bond with its attachments, the jurat or acknowledgment and the power of attorney, and the other consisted of the $300,000 bond with its jurat and power of attorney; these instruments Bartling handed to McLean for the latter to inspect. McLean immediately began to read the instruments "from one end to the other." Each instrument had all signatures already affixed, along with the seals impressed or imprinted thereon.

The bonds were signed by "Curtis J. Bohannon" as attorney-in-fact for Great American, McLean noted, and he had not seen Bohannon sign the bonds, and Bohannon was not at the closing. McLean had been concerned about the possibility of forgery under those circumstances, but he found that the seal of Great American was impressed over and through Bohannon's signature on each of the bonds as well as on the back of the bonds, and he found and read the printed acknowledgment, signed by Georgie M. Hendrix as notary, certifying over the seal of her office that Bohannon was personally known to her, had personally appeared before her and "upon oath did say that he is the attorney-in-fact of and for the Great American Insurance Company * * *; that the corporate seal affixed to the foregoing instrument is the seal of the said company; that the seal was affixed and the instrument was executed by authority of its Board of Directors, and Curtis J. Bohannon acknowledged that he executed the said instrument as the free act and deed of said Company." From the corporate seal, and the notarial certificate, McLean was satisfied that the bond had been signed by Bohannon, and he relied on the recitations as establishing the fact of such signing in accepting the bonds.

Having read the bonds and the acknowledgments (or jurats), McLean next read the power of attorney to ascertain whether Bohannon had authority to sign such a bond. The printed instrument had Great American's name printed right up at the top, was designated "Power of Attorney No. 0–5013" and recited that Great American "does hereby nominate, constitute and appoint the person or persons named below its true and lawful attorney-in-fact or attorneys-in-fact" and authorized the named persons "to execute in behalf of the said company, as surety, any and all bonds, undertakings and contracts or suretyship" not to exceed the limit "stated below." As having the authority so to act for Great American, the power named Lynn B. Gregg (whom McLean had previously learned was the Kansas City Regional Manager), Curtis J. Bohannon, and two others. The address of the attorneys-in-fact was given as Kansas City, Missouri, and under the heading "Limit of power" were the words "All unlimited." The power of attorney bore the facsimile signature of W. R. Morpeth, Jr., as Vice-President of Great American, attested by the facsimile signature of William G. Fettis, Secretary. There followed a notarial certificate whereby Morpeth acknowledged that the corporate seal affixed to the instrument was that of Great American, and that it was affixed, and his name signed to the instrument under and as authorized by the by-laws of the company. Next on the power were printed excerpts from the by-laws of Great American, authorizing the President and Vice-Presidents to "appoint and fix the compensation of one or more attorneys-in-fact, to prescribe their respective duties and the respective limits of their authority," excerpts from a resolution of the Board of Directors authorizing use of facsimile signatures and seals on any power of attorney, and finally a printed certification form over the facsimile signature of Fettis as Secretary, attesting that the power of attorney, the by-laws and the resolution had not been revoked and "are now in full force and effect." The date in the certificate was typed in

"December 7, 1966" in a blank left in the form for that purpose, and in addition to a facsimile seal, the great seal of the Company was manually impressed or cut into the certificate section of the power of attorney.

Having read the words of the power of attorney, and having observed the seals and certificates attesting its execution, McLean was thereby led to believe that Bohannon in fact had authority to execute the bond which was being tendered to the bank, and relied on the representations of the power of attorney in making the loan to Mayfair Building Corporation and William Nathan. And McLean considered that Bartling's possession of the signed bonds evidenced his authority to deliver and supported his representation as to his identity. He relied on Bartling's possession as such evidence of authority. While McLean would have been willing to lend Mayfair and Nathan a limited amount of money without the bonds as security, it would have been "nothing like the $470,000 they were talking about," and "we wouldn't have loaned Commercial Investment Company a dime, because we knew nothing about them * * * couldn't find out anything about them."

Because the language of the bonds tendered for delivery varied from the language in the bond specimen on which he had previously obtained the approving opinion of Will Wilson, McLean called Wilson and had the bond read to him, and then had the wording of the bond read by his secretary to Wilson's secretary so Wilson could have the wording in written form. After about thirty minutes, Wilson called McLean and said that he thought with one minor change the bonds would be all right, viz., that there should be in each bond language to the effect that the obligation of the surety and any payment under the bond should be made in Harris County, Texas. Before accepting the bonds, McLean discussed with Bartling the matter of adding the indicated language to the bonds, and

Bartling was agreeable to it, and the language was then typed in the bond.

It occurred to McLean that the way the bonds were written, the surety bond would not cover the payment of interest if the face amount of the notes was $470,000. He conferred with Sharp about the matter, and Sharp said he thought they could afford to trust the makers for the interest; McLean concurred. So, at that time, "we started drawing notes to comply with the bonds," one note for $170,000 being drawn for execution by Nathan and Commercial and the other for $300,000 for execution by Nathan and Mayfair. The notes were printed forms used by the bank, with names, dates and amounts inserted in blanks, and with certain provisions giving the bank the right to demand additional security if it felt unsafe, and of accelerating payment if the demand was not satisfied, was "x-ed" out by typewriter in accordance with earlier instructions by Mr. Luftig's attorney.

The notes were thereupon signed by the respective makers; the collateral pledge (or stock power) covering the Mayfair Investment Company stock which was being deposited as collateral was signed in blank and handed over along with the stock certificates covered thereby; the notes and bonds were accepted by McLean, and he in return made out a deposit slip in the amount of $470,000 to the credit of Mayfair's account, on which Nathan was authorized to draw checks. This was in accordance with the letter previously given him by Luftig so directing the deposit to be made.

Immediately after the deposit was made, Nathan, in Bartling's presence, wrote a check on Mayfair's account, payable to the Bank, in the amount of $23,500, in the corner of which was the notation "Premium on $470,000 bonds." The check was given to pay for a cashier's check which was immediately prepared, payable to Continental Investment Bankers, Inc., at the request of Bill Skillman. Skillman then and there endorsed the cashier's check "Continental

Investment Bankers, Inc. by Bill M. Skillman," and asked McLean if he would guarantee the signature. McLean replied that since he did not know whether Skillman had authority to endorse a check to Continental, he could not guarantee the endorsement; but he agreed to say and did write on the back of the check that Skillman signed in his (McLean's) presence. Thereupon Skillman turned the endorsed cashier's check for $23,500 over to Bartling, and Bartling left the bank with the check in his possession.

Nathan wrote one other check on the evening of the 8th of December, viz., one payable to Charles Luftig for $25,000, which Luftig first converted to a cashier's check payable to himself, and then the cashier's check was cashed by Luftig at the Bank before he left. While McLean did not remember authorizing cashing of the check, Joe Novotny of the Bank recalled that he had obtained McLean's approval before cashing the check for Luftig.

McLean then discovered that the notes as drawn up and signed called for interest "from maturity" instead of "interest from date," and he had the notes redrawn to correct that mistake; thereupon the rewritten notes were signed, and copies given to everybody before they left town.

The closing transaction was concluded around 7 o'clock or perhaps as late as 7:30 p. m.

On the day following closing, it occurred to McLean that with Nathan as maker on both the $300,000 note and on the $170,000 note, and with a participation of Oak Forest Bank (to which it had agreed) in the amount of $250,000, the transaction left Sharpstown over its legal limit for loans by about $100,000. He consequently called Mr. Welcome Wilson of the Homestead Bank in Houston, and the Homestead official indicated they would be interested in taking a $100,000 participating interest. McLean sent them a Xerox copy set of the loan papers, which Homestead turned over to its attorneys for inspection. Shortly afterward, Mr. Wilson of Homestead told him their attorney wanted and Wilson requested McLean to obtain "excerpts from Great American's by-laws authorizing them to issue this type of bond."

On Monday, December 12, 1966, in consequence of the Homestead request, McLean placed a long distance call for Bohannon to the regional office number of Great American in Kansas City. Bohannon was reported out to lunch, so McLean asked for Mr. Gregg, and "explained to him what we needed;" he told Gregg that "we were selling participation in this loan and we needed excerpts of the by-laws authorizing Great American to issue this type bond." Gregg replied that he knew "nothing about the bond department," that he would have "to let Mr. Bohannon talk to you" and that he would have Bohannon call that afternoon when he got back from lunch. Gregg in his testimony admitted receipt of a telephone call from a banker in Texas in December, 1966, and generally the substance of the conversation.

Later in the day, McLean received a call from a person who stated that he was Curtis J. Bohannon, who told him that Mr. Gregg had advised him that McLean wanted to talk to him. McLean explained that he needed excerpts from the company's by-laws authorizing issuance of this type of bond, because of sale of the participation and the buyer's attorney request for the excerpts. Bohannon replied that he could not give him the information directly; that they handled that through "our general agent," and that Mr. Bartling should supply the requested material. McLean asked Bohannon if he would contact Bartling and ask the latter to send the excerpts, and Bohannon said he would.

The requested excerpts not being received by December 14, McLean placed a call to the telephone in Kansas City listed for the Bartling agency, asked for Mr. Bartling, and the man he talked to at the number said he was Bartling. The man to whom he talked had no hesitancy about the subject

matter—McLean had no problem in explaining what he needed and why, and Bartling said he thought he had a copy of the requested material in his office, and if he didn't he would write to New York to get it."

On the 16th of December, McLean again called Bartling at the Kansas City phone number to inquire about the excerpts, and on that occasion Bartling told him that he had had to write New York for the by-laws, and he would send them when he could have them available.

Shortly afterward, Homestead withdrew its request for the material and accepted participation on the instruments as submitted paid plaintiff for the amount agreed, and for that reason McLean pursued the matter no further although he never did get the requested material from Bartling.

There the matter rested until on or about January 20, 1967 (after McLean had departed the bank on terminal leave), at which date Joe Novotny, who was vice-president of the Appellant at the time, received a call from a man named Fischer, of New York City, who told Novotny that he (Fischer) had information that the bank held some bonds that might be illegally written, and identified the questioned bonds as being issued by Great American. Novotny immediately placed a call to the Great American office in Kansas City, asked for Curtis Bohannon, and when Bohannon came on the line, told him that the bank had credit inquiries made concerning the bonds that he had issued to the bank in the name of Great American, and asked him to check into the bonds and "tell us if there was anything at all that was unusual about the transaction." Bohannon said it would take him about half an hour to check it out, that he did not have the files in his office, but he would call back as soon as he could. Bohannon did call Novotny back the same day, and told him that there was nothing at all wrong with the bonds, and asked why he (Novotny) was questioning the bonds, and Novotny replied that it was related to a credit inquiry.

Novotny called Fischer back and told him that he (Novotny) had checked with Great American and had the bonds confirmed. During the conversation, Fischer said that a Mr. Fettis was in the office and wanted to discuss the bonds; Novotny talked guardedly to Fettis, having doubts as to just who it was he was talking to and what interest that person might have.

Later in the day a Mr. Al Lanford, of the Houston claims department of Great American (who was present at trial but did not testify), came by and looked at the bonds, told Novotny the bonds looked all right, and arranged that they would talk long distance with Mr. Bivin (who is identified in the record as Vice-President in charge of claims of Great American) that evening at 7:00 o'clock. Bivin in the telephone conversation expressed confidence in Bohannon, said copies of the bonds might just not have arrived at the New York office, and it was arranged for the bank to send Xerox copies of the bonds to Great American's New York office.

On the following day, January 21, 1967, Novotny wrote a letter to Fettis, requesting that Great American affirm the validity of the bonds. Under date of March 6, 1967, Great American wrote in response that while it had not completed its investigation, it took the position that neither the bonds nor the obligations they purported to cover were binding on Great American.

When plaintiff attempted to take Bohannon's deposition in Kansas City, he responded to questions as to his name and address, but invoked the Fifth Amendment and refused to answer all other questions propounded to him by plaintiff.

It was established by other uncontroverted evidence, however, that Curtis J. Bohannon at all times material was employed as "Superintendent of the Bond Department" in the Regional Office of Great American at Kansas City, Missouri, and that Bohannon resigned that position effective January 27, 1967. While Bohannon for administrative purposes only (ex-

pense accounts, pay-checks, etc.) was under the direction of Lynn Gregg, who was Regional Manager, Bohannon was the one who was in charge of bond matters for Great American in the Kansas City office, and derived his authority directly from New York, and reported to Mr. Fettis, the Secretary of the Company who was in charge of the fidelity and surety bond department of the company.

Gregg testified that he (Gregg) had no experience in the writing of bonds, knew little about the field, and although his own name was on the power of attorney, it was only to enable him to sign bonds authorized or approved by someone in authority. He did not know what limits there were on Bohannon's authority, or on Mrs. Hendrix's authority at the time his deposition was being taken. If somebody called about a bond matter, unless it was a service complaint, Gregg would simply tell the man he didn't know about bonds, and would refer the inquiry to the head of the bond department, viz., Bohannon, during the latter's tenure. Gregg remembered receiving a call from a banker in Texas in the latter part of the year 1966 and when the banker started talking about bonds, he did what he routinely did, viz., told the caller that he (Gregg) did not know about those things, and referred him to Bohannon.

It was admitted by Great American that the power of attorney 0–5013 was duly executed by the officers whose names were shown subscribed thereto; that the excerpts from the by-laws and resolutions printed thereon were in effect at all times material, and that the power of attorney with Bohannon's name on it as attorney-in-fact was revoked by Great American on January 25, 1967.

Mr. Fettis, who was Secretary of Great American, at the home office and chief executive officer of Great American's bond department testified that since surety bonds vary in content both by reason of subject matter and varying laws in different sections of the country, it is not possible for an insurance company to print up a relatively few forms with facsimile signatures of home-office officials to become effective upon countersignature of some local agent as it is with insurance policies. In order to carry on a suretyship business, all insurance companies find it necessary to appoint attorneys-in-fact "to sign on behalf of the company," and he testified that such attorneys-in-fact are "empowered by issuing to the individual a power of attorney." It is Great American policy not to grant a dollar limit of power in excess of what is normally the need of the holder of the power of attorney, but to carry on the business it is necessary to give some of its attorneys-in-fact "unlimited" powers.

Fettis further testified that powers of attorney are furnished by the Company to its attorney-in-fact to enable them to satisfy someone who "had asked for proof of the validity of the bond," particularly as to the authority of the attorney-in-fact to execute it. Great American furnished printed copies to its attorneys-in-fact, including Bohannon, in numbers, with the date left blank on the certificate attesting that it was still in effect, and the holder of the power was authorized to fill in the date "when he utilizes a copy of his power." The Company also gave him a seal with which to attest the authenticity of his act on behalf of the Company, including the authority to impress or affix the seal to the power of attorney if the purchaser of the bond required it. Attorneys-in-fact of Great American were authorized to furnish such copies of their powers "to the people who are interested in knowing, because they are the ones receiving the bond and relying on it, that the man who signs it has the power to execute it" on behalf of the surety. In putting the powers of attorney out, and in authorizing the attorneys-in-fact to use their powers of attorney in the method described above, Great American "expected the people to whom they were tendered to be able to rely on them" and intended that they should rely on them. Fettis stated that Great American could transact a suretyship business in no other way as a prac-

tical matter: "It is only in this fashion in which we can operate as a company."

After the above facts had been established, Great American was permitted to have Fettis testify that while it had given Bohannon the unlimited power of attorney, that instrument was intended only to be used for the purposes and in the manner above related, viz., satisfying prospective obligees of the power of the attorney-in-fact, and that Bohannon's actual authority was derived from and was limited by what Fettis terms "letters of authority" as well as by oral limitations expressed to Bohannon. These letters of authority were introduced as constituting the entire written instructions to Bohannon as to the "use of his power of attorney form" and Fettis was permitted to read various dollar and other limitations on Bohannon, and to testify that he considered the bonds in suit to be "note guaranty bonds" which Bohannon had "no authority" to write.

It was developed by Fettis' testimony that the "letters of authority" were a sort of "private communication" between the company and Bohannon; that Bohannon was not supposed to go about delivering or showing his letters of authority to a person who wanted to obtain a bond. And while Fettis declined to characterize the instruments as "confidential within the company" as Mrs. Hendrix had in her deposition testimony, he conceded that they were not public knowledge, and that it was not intended that the public should ever have to read one of them to buy a bond.

It was further developed by Fettis' testimony that the "letters of authority" were intended to spell out to Bohannon what classes, types and amounts of bonds he could write "in his sole discretion, without referring them to the company for prior approval." When he was presented with a proposed bond which was of a type or amount which he was not authorized to write on his own, if he thought well of the matter, Bohannon was not supposed to tell agent or buyer that such bonds were beyond his authority, but he was supposed to collect

the information needed for "underwriting" or appraising the risk, and submit the matter to the home office in New York. In such event, Fettis testified, "if in the judgment of my staff" the bond which was over Bohannon's limits or of a forbidden type "could be written under certain conditions, the conditions would be spelled out, * * * and then he could be instructed * * * to write the" bond. If so approved by the home office, Bohannon after first seeing to it that any collateral required was deposited or other condition specified by the home office was performed, and he would then sign the bond and attach (as evidencing his power to execute such bond) his power of attorney; viz. 0–5013, just as he did with bonds he could write on his own.

It was further established on cross-examination of Fettis that Great American does write note guaranty bonds, as well as other bonds which guarantee obligations to pay money. More precisely, he testified that certain officers of the company have authority to write "certain classifications of note guaranty bonds;" and that they did not write other types of note-guaranty bonds, but apart from saying that the bonds in suit were of the type they did not write, he never explained what classes of note guaranty bonds are not written. He said that "this is not an area in which we indulge to any extent," but did indulge "to some extent."

Fettis was asked to suppose that Mr. Bartling thought he had a very good deal for a note guaranty bond, which proposal he took up with Bohannon, and was asked whether Bohannon was expected to submit the proposal to New York for consideration, just like he would a supersedeas bond of more than his limit, and whether the procedure for its approval (if it were found to be of the type the company did write) would be the same. He answered that it would be the same in both cases. And he testified further that if the writing of the proposed bond were approved, Bohannon would sign and execute the note-guaranty bond (after seeing to it that any prescribed

conditions had been satisfied), and attach his power of attorney 0–5013 to the bond.

The post-closing telephone calls to Bohannon have already been mentioned; it should be noted here only that he did not disavow the bonds in those conversations.

In addition, it was established that the bonds were written on paper especially prepared with Great American seal and marginal scrolls, which was identified as "manuscript bond form" used in the Regional Office to type up bonds that did not fit common forms. Mrs. Hendrix testified that she did not take Bohannon's acknowledgment, despite her notary certificate, and testified that Bohannon had her sign up a bunch of such jurats, with blanks for the name of the person acknowledging, and the date, for use during her absence; but she further testified that only Bohannon in the Regional Office continued to use the "jurats" in executing bonds.

The evidence established that G. Bartling & Co., Inc. was a Kansas City, Missouri, agency which did an insurance and bond business, associated with several insurance companies. Great American had what it characterized in the answers to interrogatories as a "business relationship" with the Bartling agency; Fettis in his testimony stated that it "was a valued agency * * and wrote a very considerable volume of profitable insurance business with us." When the relationship began, it was "just with Bartling" individually; the agency was later incorporated.

It was established that Gilbert Bartling, Jr., was the President of G. Bartling & Co., Inc., and that he was personally an agent of Great American. Mrs. Hendrix in her testimony stated that Bartling had authority to deliver bonds which she and Bohannon signed; Gregg testified that Bartling was authorized to deliver bonds for Great American "if it was an authorized bond," and that "In another state it would have to be countersigned by an agent in that state" and Fettis testified that Bartling at the times material here was authorized to deliver bonds "within the area in which he was licensed to do business for our company." Great American introduced an agency agreement between Great American and Bartling which recited that he was appointed "correlary agent in Kansas for G. Bartling & Company, Inc." and that "the Company hereby grants authority to the Agent to receive and accept proposals for such classes of insurance covering risks located in Overland Park, Kansas, and vicinity."

It was established by the uncontroverted testimony of William Skillman that it was Gilbert Bartling, Jr., to whom he made application on behalf of Commercial to obtain issuance of the bonds. The matter had been taken up with Skillman by either Mende or Luftig on behalf of Commercial, and he was furnished, and transmitted to Bartling, a financial statement on Commercial and other supporting documents for the bonds. Bartling later told Skillman that it might be possible for the bond to be issued. They had other conversations as to what the exact requirements, terms and conditions would be, and these were passed on by Skillman to Mende, Luftig and perhaps to Nathan. Skillman did not know Bohannon personally, and did not have any conversations with Bohannon regarding the bonds. His next recollection in the sequence of events was his making the trip with Bartling to Houston and "Bartling physically delivering the bond" at the Sharpstown State Bank.

On cross-examination, Skillman admitted that in the past his insurance license in Missouri had been cancelled and that he had paid a fine in connection with some transaction in which he was charged with acting for an "Authors Insurance Association" without authority to represent them, and that in 1957 he had been "filed on on a warrant from Kansas, charging the issuance of a bogus check."

But Skillman stated on redirect that he had known Gilbert Bartling, Jr., for some fifteen years, and there was no question but

what the man who went to Houston with him in December 1966 was the man he had known for fifteen years as Gilbert Bartling, Jr.

As was stated above, the jury found in answer to Special Issue 1 that Bohannon was without "apparent authority * * * to sign the bonds," and in answer to Special Issue 4 that Bartling was without "apparent authority * * * to deliver such bonds to the plaintiff" (Appellant). The trial court on Appellant's motion for judgment notwithstanding the findings ordered the finding set aside with respect to Bohannon and declined to set aside the answer to Special Issue 4 pertaining to Bartling's authority.

■ The uncontroverted evidence establishes as a matter of law that Great American had so clothed Bohannon with the indicia of authority as to lead a reasonably prudent person in Appellant's situation to believe he had the authority to execute the bonds in suit.

As has been noted, the principal, Great American furnished its agent Bohannon as Superintendent of the bond department in its Kansas City Regional Office a power of attorney reciting that he was authorized and empowered to execute on its behalf "any and all bonds, undertakings and contracts of suretyship" in "unlimited" dollar amounts.

The written power of attorney was intended by Great American for the use of the agent in satisfying persons who were proposing to buy or to rely on a bond signed by Bohannon that he had the authority to act for the company in its execution, regardless of the size or type of surety bond involved. The power was necessarily intended to be shown to such persons since its purpose was to induce them to accept bonds signed by its attorney-in-fact; and Fettis testified that as a practical matter the company could not operate a surety bond business otherwise. The intended use thus had a business purpose, and was to expedite the business affairs of Great American.

On the other hand, the instructions and limitations set out in the "letters of authority" to Bohannon were not intended to be made public; they were characterized by Mrs. Hendrix as "confidential" in nature. At any event, they were private instructions not intended to be exhibited or communicated to persons who were asked to rely on bonds signed by Bohannon. That the Appellant was completely unaware of their existence is not capable of dispute under the record. In reliance on the representations, in the power, and unaware of the private instructions, plaintiff accepted the bonds as security, and made the loans it otherwise would not have made.

■ In situations where the indicia of authority consist of express representations set out in a written power of attorney, the applicable rule is clear, and is established by repeated decisions; persons innocently dealing with the agent in reliance on the authority he is represented to have are not affected or bound by private restrictions placed by the principal on the authority of the agent. Merriman v. Fulton, 29 Tex. 97, 98 (1867).

The principle has been applied in Texas to acts done and contracts made by agents of insurance companies in violation of express instructions unknown to the third party. Amarillo Nat. Life Ins. Co. v. Brown, 166 S.W. 658, 662 (Tex.Civ.App. Amarillo, 1914); Missouri State Life Ins. Co. v. Woodson, 256 S.W. 988, 995 (Tex. Civ.App. Dallas, 1923, er. dism'd, w. o. j.); Standard Fire Ins. Co. v. Buckingham, 211 S.W. 531 (Tex.Civ.App. Austin, 1919, no writ).

The only question which remains is whether the circumstances of the case were sufficient to require the Appellant to disbelieve and disregard the express representations which Great American made as to Bartling's authority.

It was established by the undisputed evidence that the Gilbert Bartling, Jr., who delivered the bonds to plaintiff was in fact one of the agents of the defendant Great

American and was such an agent as was used by Great American to sell and to deliver surety bonds issued out of or executed by authorized personnel in the Regional Office of the defendant Great American in Kansas City, Missouri, including Bohannon, who signed the bonds.

While there was some attempt on the part of Great American's officers and employees to say that Bartling was authorized to deliver only "authorized bonds," such authority necessarily gave him at least apparent authority to deliver a bond signed by Bohannon which was over the limits prescribed in Bohannon's private instructions, or was of a type he was required to first submit to the home office. The point here is that Bartling was one of Great American's agents, and that the question involved is not whether he was such an agent, but is one involving the scope of his authority, or apparent authority, so far as delivering the bonds is concerned.

It was established by the undisputed evidence that Bartling came to the office of the plaintiff in Houston, Texas, and that he had in his possession at the time original bonds which Bohannon had signed on behalf of the company, expressly payable to plaintiff as named obligee; that the seal of the company was affixed to the bonds; and that there was attached to the bonds the notarial certificate of Mrs. Hendrix as a notary, that Bohannon had acknowledged executing the bonds as the act and deed of the company. In addition, there was attached to the bonds Bohannon's power of attorney, signed by high company officers, attested by its seal and by excerpts from by-laws and resolutions, asserting that Bohannon was its attorney-in-fact and had authority to write "any and all surety bonds" on behalf of the appellee Great American, in amounts unlimited as to dollars. And in this same power of attorney, there appeared the name of Lynn B. Gregg represented as a person authorized to write bonds equally with Bohannon, but with no greater authority than Bohannon; and the undisputed evidence revealed that Appellant's officers had established by inquiry of known local agents of Great American in Houston, Texas, that Lynn B. Gregg was the Regional Manager of the appellee Great American's Regional Office in Kansas City, Missouri.

The uncontroverted evidence established that these executed writings which Bartling had in his possession and which he exhibited to the Appellant did in fact satisfy the Appellant that he had the authority which he told them he had, and that it paid out great sums in reliance thereon. The question for consideration here is whether this evidence is sufficient as a matter of law to have permitted the officers of Appellant bank to rely on the bond.

The general rule is stated in Section 26:67 of Couch (Anderson) on Insurance, 2d (Lawyers Co-op Publishing Co., 1960). After first noting that "Possession of an insurer's application blank, sample policies, and like material, does not in itself create an appearance of authority sufficient to bind the insurer," the text states that on the other hand:

"The fact that an insurance agent has in his possession policies signed by officials of his company, and which only require countersignature by an agent to become effective, is, however, sufficient evidence of an agency, and warrants an applicant in relying thereon, for third persons having no knowledge to the contrary may rely on the ostensible authority of an agent to enter into binding contracts of insurance on behalf of the insurer, where the insurer furnished the agents with forms which, when executed, constitute contracts of insurance."

This principle has been applied in two Texas cases regarding contracts of insurance companies, viz., International Fire Insurance Company v. Black, 179 S.W. 534 (Tex.Civ.App. Texarkana, 1915, er. ref'd; and Standard Fire Insurance Company of Hartford v. Buckingham, supra; Prowse v. Whitehurst, 313 S.W.2d 126 (Tex.Civ. App. San Antonio 1957, writ ref'd n. r. e.).

Under the authority cited above we hold that in giving Bartling possession of the signed contract naming Appellant as a party thereto, which contract is in such form as to become effective on delivery, the agent is by such possession invested as a matter of law with apparent authority to deliver the contract to the Appellant promisee. Appellant had no actual knowledge that Bartling was exceeding his authority in delivering the bonds to it unless Appellant was by the circumstances of the transaction placed upon inquiry as to Bartling's authority. We can find no circumstances that should have so alerted them. Independence Indemnity Co. v. Industrial Realty Co., Sup.Ct., Ga.1933, 178 Ga. 45, 172 S.E. 33; Court of Appeals, 46 Ga.App. 637, 168 S.E. 122.

Alone, and in combination, the circumstances of the transaction were not such that a reasonably prudent person in Appellant's position would be required to disbelieve the evidence of the written power of attorney, as to Bohannon's authority, and the evidence of Bartling's authority to deliver the bonds arising from his possession of the bonds and accompanying papers, and to go behind those evidences of authority on the premise that the agents involved may somehow be defrauding the surety company or were violating the powers entrusted to them.

Even, for purpose of argument, had the circumstances of this case demanded further inquiry, Appellant would have learned nothing contrary to what it had already been led to believe by further inquiries of the Regional Manager concerning Bohannon, or from either concerning Bartling. One placed upon inquiry is not required to make unlimited investigation, rather he is charged with making such inquiry of such sources of information as would be indicated by the circumstances to a reasonably prudent person, The Bethlehem, 4 F.2d 308 (C.C.A. 3rd, 1925); Merrill On Notice, Secs. 67–68. Moreover, it is essential the inquiry upon which one is put would, if prosecuted, result in knowledge of the fact sought to be imputed. Merrill On Notice, Sec. 68; W. G. Coyle & Co. v. North American S. S. Corporation, 262 F. 250, 254 (1920); Downing v. Jeffrey, 195 S.W.2d 696 (Tex.Civ.App. Texarkana, 1946, er. ref'd, n. r. e.).

## II.

Appellees have twelve Cross-Points, the first being the error of the trial court in refusing to grant leave to Great American to file its Third Party action against Frank W. Sharp, Lee G. Wiley, Milton Z. Mende, Bill M. Skillman, and others against whom Great American sought indemnity.

We overrule this point.

Appellee cites us to Texas Rules of Civil Procedure, rule 38 relating to Third Party Practice. However, it was disclosed to the court as to the claim of Appellee that Wiley and Sharp were "undisclosed principals" with Nathan by reason of some partnership or other arrangement between them, that venue could not be maintained against Wiley and Sharp in Travis County since neither was a necessary party to Appellant's suit. Union Bus Lines v. Byrd, Sup.Ct., 142 Tex. 257, 177 S.W.2d 774 (1944); Tarrant v. Walker, 140 Tex. 249, 166 S.W.2d 900 (1943); Reed v. Buck, 370 S.W.2d 867 (Tex.1963). Their proposed joinder was, therefore, forbidden by Tex.R. Civ.P. paragraph (d) of Rule 38 permitting impleading of third party defendants but admonishing that the rule shall not be applied so as to violate any venue statute, as venue would exist absent the rule.

Another reason for denying this impleading is that the suit had been on file for ten months during which time no attempt to implead the third parties had been made. During this time extensive depositions had been taken. Consequently, the addition of new parties would have confused and delayed the trial. The trial court did not abuse his discretion in overruling this motion. Andrews v. Rice, 198 S.W. 666 (Tex. Civ.App. Galveston, 1917, er. ref'd).

Appellee's Cross-Points two and three, briefed together, are the error of the trial court in sustaining Appellant's special exception Number 1 which action resulted in striking Sec. 5, Paragraph (a) of Appellee's Second Amended Original Answer which pleaded that Appellant's officers knew that neither Bohannon nor Bartling were residents of Texas and did not hold a license as a Texas Local Recording Agent; and that the fact that the provisions of Art. 21.09, Insurance Code, V.A. T.S., required the countersignature of and delivery by a Texas Local Recording Agent's notice of their lack of authority to execute and deliver the bonds in question was given to Appellant. The error of the trial court in sustaining Appellant's special exception Number 2 which action resulted in striking Sec. 7, paragraph (b) of Appellee's Second Amended Original Petition which pleaded that the bonds were invalid, as a matter of law, because of the provisions of Article 21.09, Insurance Code.

We overrule these points.

The precise question as to the effect upon the validity of the policy of the agent's lack of a required license was passed upon by the Texas Courts in Kansas City Life Ins. Co. v. Elmore, 226 S.W. 709 (Tex. Civ.App. Amarillo, 1920, no writ), where the Court said (at page 718):

"The thirteenth assignment urged that the trial court was in error in rejecting a statute of Oklahoma to the effect that all insurance agents should procure license as such before authorized to act, and, as it had been denied by appellant and pleaded that Stewart was not such agent, the court should have admitted the statute. Without discussing the question further than to say it was alleged by the appellee that the Laverne bank was the collecting agent, and if it in fact was an agent of appellant, it was the duty of appellant to see if a license was required that its agent provided such."

As the Elmore case establishes, the only penalties for violation of those statutory requirements are inflicted upon the insurance company, and upon the agent—not upon the insured or upon the public, for whose protection the statutes were designed.

By similar reasoning, other Texas cases have established that the failure of the insurance company to obtain the license required of it, or its failure to obtain a permit to do business as required by statute, cannot be made the vehicle for exonerating it from liability upon policies issued by it to members of the public. Millers' Indemnity Underwriters v. Patten, 238 S.W. 240 (Tex. Civ.App. Amarillo, 1922, aff'd 250 S.W. 154); United Services Automobile Ass'n v. Zeller, 135 S.W.2d 161 (Tex.Civ.App. San Antonio 1939, er. dism'd).

Appellee's Cross-Point Four is the error of the trial court in overruling Appellee's Motion for Instructed Verdict which asserted as one of its grounds that Appellant offered no evidence upon which estoppel could be based.

We overrule this point and refer to the facts of this case stated above.

Appellant's Cross-Point Five is the error of the court in overruling Appellee's Motion for Instructed Verdict which asserted as one of its grounds that the bonds were illegal and void by reason of statutes of the State of New York, the state of incorporation of Great American, which prohibited it from issuing bonds of the type made a basis of this suit.

We overrule this point.

Appellee argues that Article 4, sec. 46, par. 16(b) of the New York Insurance Law, McKinney's Consol.Laws, c. 28, prohibits insurance companies chartered under New York law from "[b]ecoming a surety on, or guaranteeing the performance of * * * a contract of indebtedness secured by title to, or mortgage upon, or interest in, real or personal property."

They interpret this provision as prohibiting the underwriting of the bonds in

suit, because they contend the notes or indebtedness was secured by collateral pledge of "500 shares of stock of Mayfair Corporation."

Appellee thus interprets the statutory provision as permitting an insurance company to issue a surety bond guaranteeing the performance of an unsecured note, but that the provision forbids guaranteeing the performance of a note where there is so much as a dollar of collateral security in addition.

The wording of the statute is, in the first place, in terms of grant of authority to the companies organized under the New York law, viz., any such company is authorized to engage in the business of "Becoming surety on, or guaranteeing the performance of, any lawful contract, except the following: * * *" (Subparagraph 16(b), Section 46, New York Insurance Law). The provision quoted by Appellee is one of the exceptions to the grant of authority. But Section 46 is only one of the provisions of the New York Insurance Law, and is to be read in the light of other provisions of the same statute, especially Section 143, which reads in pertinent part as follows:

§ 143. Non-conforming contracts; law governing contracts

1. Except as otherwise specifically provided in this chapter any contract or policy of insurance or annuity contract delivered or issued for delivery in this state in violation of any of the provisions of this chapter shall be valid and binding upon the insurer making or issuing the same, but in all respects in which its provisions are in violation of the requirements or prohibitions of this chapter it shall be enforceable as if it conformed with such requirements or prohibitions.

Assuming the bonds had been executed and delivered in New York, they still would be enforceable as between the Company and the obligee, under the "explicit statutory declaration" of subdivision 1 of Section 143, New York Insurance Law.

Posner v. U. S. Fidelity & Guaranty Co., 33 Misc.2d 653, 226 N.Y.S.2d 1011 (1962).

It was, moreover, established that Great American as a foreign insurance company had applied for and had accepted a permit to do business in Texas, under the conditions of Art. 21.43 of the Texas Insurance Code (and its predecessors), whereby it is provided:

"The provisions of this code are conditions upon which foreign insurance corporations shall be permitted to do business within this state, and any such foreign corporation engaged in issuing contracts or policies within this state shall be held to have assented thereto as a condition precedent to its right to engage in such business within this state."

Great American not only impliedly so agreed; it expressly so agreed.

One of the provisions of the Texas Insurance Code to which Great American agreed, and by which it is bound, is Article 21.42, which provides that:

"Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby * * *."

■ Having elected to do business in Texas, and having accepted the condition that its policies and contracts should be tested and governed by the laws of Texas, Great American cannot say at any event that the validity of its Texas contract is to be determined by the laws of New York.

Appellee's Cross-Point Six is the error of the trial court in overruling Appellee's Motion for Instructed Verdict based on the ground that it being undisputed that Appellant changed the wording of the bonds without permission of an authorized representative of Great American.

We overrule this point.

The language inserted by Bartling's consent (inserting that the obligation of the surety to make payments would be in Houston, Harris County, Texas) did not change the obligation of Great American already sustained, and the change was, consequently, immaterial. 53 Tex.Jur.2d 603; Park Presbyterian Church of Italy v. William Cameron & Co., 58 S.W.2d 63 (Tex.Com.App.1933).

Appellee's Cross-Point Seven is the error of the trial court in overruling Appellee's Motion for Instructed Verdict it being undisputed that the underlying notes creating the primary obligations of the bonds were not in being at the time of the alleged delivery.

We overrule this point.

It is undisputed that Bartling retained control of the bonds, and did not deliver them (and Appellant did not accept delivery of the bonds) until the notes had been drawn to conform to the bonds, and the principals signed the notes. Thus, legally, Bohannon retained the bonds in his control through Bartling's possession, until all the papers to be delivered had been executed. Then they were simultaneously delivered to and accepted by Appellant.

Even if the bonds had been delivered to Appellant as obligee before the notes were signed, the bonds still would be binding. 72 C.J.S., § 47, Principal and Surety, page 535.

Appellee's Cross-Point Eight is the error of the trial court in failing to submit to the jury Appellee's specially requested issue inquiring as to whether Sharpstown Bank had notice of facts putting it upon inquiry which would have disclosed that Gilbert E. Bartling, Jr. was not authorized by Great American to issue the bonds in question and the accompanying definition of "notice."

Appellee preserves this point to meet any contentions of Appellant concerning estoppel existing separate and apart from estoppel as an element of apparent authority. Since our decision is not predicated on any such theory, we overrule this point.

Appellee's Cross-Points Nine and Twelve, briefed together, are the error of the court in failing to submit to the jury Appellee's specially requested issue inquiring as to the existence of a conspiracy and the accompanying instruction concerning circumstantial evidence; the error of the court in sustaining Appellant's objection to Appellee's offer in evidence of the criminal record of Milton Z. Mende, and the testimony of witnesses Wiley, Nathan, and Bivin concerning various features of the pleaded conspiracy.

We overrule these points.

There is no evidence of a conspiracy in this record; consequently, the trial court's ruling was correct.

Appellee's Cross-Point Ten is the error of the trial court in disregarding the answer of the jury to Special Issue Number 1, which determined that Curtis J. Bohannon did not possess apparent authority to sign the bonds in question.

We overrule this point.

Appellee's Cross-Point Eleven is the error of the trial court in allowing Appellant to introduce repeatedly in evidence over proper objection various extra-judicial statements purportedly made by Gilbert E. Bartling, Jr., to officials of Appellant concerning his agency relationship and his authority to bind Great American in the bond transaction.

We overrule this point.

While the proof of agency and scope of agency cannot be proved by state-

ments and declarations of the purported agent alone, it is well established that they may be admitted in corroboration of other evidence of agency. Cook v. Hamer, 158 Tex. 164, 309 S.W.2d 54 (1958).

We reverse that portion of the judgment of the trial court that Appellant take nothing and hereby render judgment for Appellant against Great American Insurance Co. on the respective bonds, along with the principals. The remainder of the judgment is affirmed.

Reversed and rendered in part, and in part affirmed.

## ON MOTION FOR REHEARING

It has been called to our attention that the question of interest has not been adjudicated herein.

In the case at bar, Great American as surety repudiated the bonds prior to the date (December 7, 1967) on which Appellant as obligee could have made demand upon the surety to pay the amount the principals failed to pay. In view of the repudiation by Great American, Appellant was relieved of making a useless formal demand on the surety for payment. American Fidelity & Casualty Co. v. Williams, 34 S.W.2d 396, 403 (Tex.Civ.App. Amarillo, 1931, error ref'd); Womack v. Allstate Ins. Co., 156 Tex. 467, 296 S.W.2d 233 (1957); Restatement of Contracts, Sec. 306 and Comment.

In the circumstances, Great American's obligation to pay Appellant arose immediately on the failure of the principals to pay on December 7, 1967 the sums assured by the bonds. It therefore became liable for interest at the legal rate (Tex. Rev.Civ.Stat.Ann. art. 5070) from December 7, 1967 on the $300,000 and $170,000 sums it failed to pay at that time.

Appellees' Motion for Rehearing is overruled.