Fay A. HULSEY et ux., Appellants,

v.

Willard I. DRAKE, Appellee.

No. 11751.

Court of Civil Appeals of Texas, Austin.

July 22, 1970.

Rehearing Denied Aug. 31, 1970.

John S. Wade, Byrd, Davis, Eisenberg & Clark, Jack C. Eisenberg, Austin, for appellants.

Carr, Osorio, Palmer, Dickson, Long & Coleman, T. B. Wright and Tom Long, Austin, for appellee.

O'QUINN, Justice.

This lawsuit resulted from a rear-end automobile collision, following which Wilma Faye Hulsey, one of the appellants, sued to recover for a whiplash injury to her neck.

The sole question is whether the jury's findings of no pain and suffering, no loss of wages, and no value for medical and hospital services rendered by the United States government are against the great weight and preponderance of the evidence.

The jury found that the defendant, driver of the automobile colliding with the rear of plaintiffs' car, failed to keep a proper lookout and that this failure was a proximate cause of the collision. The jury also found that $125 would reasonably compensate plaintiffs for damage to their automobile.

When the jurors during their deliberations advised the trial court that they were unable to reach agreement as to the amount of medical services, the attorneys agreed on an answer to that special issue. The trial court then advised the jury in writing that counsel for the parties had agreed on an answer and that the jury need not answer the issue.

Upon the jury's findings as to proper lookout, proximate cause, and damages of $125 to plaintiffs' automobile, "and in view of the agreement of counsel with respect

to" the issue on medical expenses, the trial court found that plaintiffs were entitled to judgment in the sum of $796. This sum included $125 for damages to the automobile and $671 for medical expenses, the amount agreed upon by the attorneys.

Plaintiffs below contend on appeal that the effect of the jury's findings of no pain and suffering, no loss of wages, and no value for medical services provided by the United States are in effect a finding of no injury resulting from the collision which is against the great weight and preponderance of the evidence. Appellants further contend that the defense of no injury is not available to appellee in this Court under the rule of Texas and Pacific Railway Company v. Van Zandt, 159 Tex. 178, 317 S.W.2d 528 (1958).

We have examined the record with care and we find that there is sufficient evidence to support the findings of the jury and that the findings are not against the great weight and preponderance of the evidence. We do not regard the rule of the Van Zandt case applicable under the facts of this case.

We affirm the judgment of the trial court.

The collision occurred on a public street in Austin in February, 1966, at a point where traffic had been temporarily halted by a firetruck answering an alarm. Appellants, Fay A. Hulsey and his wife, Wilma Faye Hulsey, were riding in their automobile, accompanied by Mrs. Hulsey's mother and the Hulseys' teen-age daughter. Mr. Hulsey, who was driving the car, stopped their vehicle beside the firetruck and the appellee, Willard I. Drake, stopped his automobile back of the Hulsey car. Hulsey moved his vehicle forward slowly, followed by Drake, but when the firetruck also moved forward and made a turn in front of Hulsey, he brought his car to a sudden halt. The Drake automobile collided with the rear of the Hulsey car, leaving skid marks of five feet. It appears undisputed that the Drake car was traveling between five and ten miles an hour when

Drake discovered that the Husley car had stopped.

The jury found that Drake failed to keep a proper lookout and that this was a proximate cause of the accident. The jury acquitted Hulsey of contributory negligence. Damage to neither car was extensive. The Hulseys delayed about two months without having damage to their car repaired, then allowed $125 when they sold or traded the car.

At the scene of the accident Drake inquired of the Hulseys whether anyone had been hurt and he was told by the occupants of the vehicle that no one was hurt. When a police officer arrived to investigate the accident Mrs. Hulsey told him she had heard and felt a pop in her neck. The officer stated in his report that Mrs. Hulsey had sustained a "whiplash neck." The police report showed that Mrs. Hulsey declined medical treatment. The Hulseys drove to their home from the accident scene.

Mrs. Hulsey testified that she heard and felt a pop in her neck when the collision occurred. The accident happened on Wednesday, and Mrs. Hulsey said that that night she experienced a muscle type of soreness and by Sunday she could not eat, that her neck "had swelled" and she "could not swallow" her food. Mrs. Hulsey was a keypunch operator for the internal revenue service and went to work on Monday, when she said the "pain began to really get to" her, and she "began to try to find a doctor." Next day, on Tuesday, Mrs. Hulsey made an appointment to see a doctor on the following Friday.

Prior to the accident Mrs. Hulsey had arranged to see a doctor at Bergstrom Air Force Base in Austin, where her husband was in military service, about the possibility of a breast tumor and kept the appointment on Friday, two days after the accident. Mrs. Hulsey testified that she could not recall whether she mentioned to the doctor soreness or pain from the accident. On Monday following the accident, the day Mrs. Hulsey said the pain began to get to

her, Mrs. Hulsey again went to a doctor at Bergstrom about the breast tumor. She was unwilling to testify that she spoke to the doctor at that time about pain in her neck originating from the collision of the previous Wednesday.

The first doctor Mrs. Hulsey consulted about neck pains following the accident was Dr. Jerry D. Julian, an orthopedic surgeon in Austin. From February 25, 1966, to August 30, 1967, Mrs. Hulsey was seen by Dr. Julian on thirteen occasions. On her first visit to Dr. Julian, Mrs. Hulsey stated she had been involved in an automobile accident nine days before and was having neck pain associated with intermittent headaches and had aching in her right shoulder. Neurological and X-ray examinations were normal. The diagnosis was acute cervical muscular and ligamentous sprain. Mrs. Hulsey was given a muscle relaxant and started on cervical traction and hot packs, and was fitted with a cervical collar.

Dr. Julian saw Mrs. Hulsey at intervals of two or three weeks through March and April, and continued improvement was noted. Neurological examinations continued to be normal. Mrs. Hulsey reported occasional neck discomfort and stiffness following prolonged sitting and strenuous activity. On July 15, 1966, two and a half months after the last examination in April, Mrs. Hulsey again consulted Dr. Julian and reported doing well, although she still had neck discomfort after prolonged sitting and strenuous activities. The doctor noted no muscle spasm, minimal tenderness, and neurological examination again was normal.

In April Mrs. Hulsey had undergone surgery for removal of breast tumors. Mrs. Hulsey testified that there were several occasions during the time she was "going through the breast problems" that Dr. Julian told her that perhaps it was "the nervous tension from this" that caused her pains for which she was undergoing the therapy prescribed by Dr. Julian.

Following the visit of July 15, 1966, Mrs. Hulsey did not see Dr. Julian until early in October. At that time Mrs. Hulsey reported progressive increase in left shoulder pain and pain in her left arm, with a tired and weak feeling in the arm. Dr. Julian had the impression the patient might have symptoms of cervical disc syndrome, or at least nerve root impingement. Mrs. Hulsey was referred to Dr. Robert Farris, a recognized neurosurgeon, who reported "Cervical sprain. Possibility of cervical disc protrusion, insufficient findings at this time to definitely diagnose." Dr. Farris recommended continuing the therapy being administered under Dr. Julian.

In February of 1967, about a year following the collision, Mrs. Hulsey reported to Dr. Julian that she had had little pain in her neck since early in January. Examinations again showed her condition normal, except a "slightly decreased sensation along the ulnar border of the hand."

When Mrs. Hulsey saw Dr. Julian again, late in May, 1967, she reported progressive increase in neck and arm pain "with also some low back and leg discomfort." Her leg and arm tired easily, and although Mrs. Hulsey had continued to work, she stated she could not participate in strenuous activities. She reported loss of weight. Neurological examination was normal. X-ray examination revealed a small osteotype formation, a change from an examination made in February of the previous year. Dr. Julian's records showed that, "For this reason and for continued symptoms, she was referred again to Dr. Robert Farris."

After the second examination of Mrs. Hulsey, Dr. Farris was unable to diagnose her problems because of insufficient objective findings. Dr. Farris found, "Although the patient has some cervical degenerative disc disease and some ligamentous or muscular complains [sic] of the entire spine, I believe her symptoms are out of proportion to their gravity and that she becomes distraught excessively without just and due cause and I believe that she

becomes panicked in thinking about her situation." Dr. Julian testified that degenerative disc disease Dr. Farris reported is caused by, "Aging, multiple minor injuries, a major injury, process of living and getting older, some disc degeneration."

Mrs. Hulsey saw Dr. Julian shortly after the second examination by Dr. Farris and thereafter continued the therapy prescribed. In June and again on August 1 and August 30 Mrs. Hulsey saw Dr. Julian, who stated that she "continued to be symptomatic." On the last date Mrs. Hulsey complained of "neck pain, headaches, right arm pain, low back pain, right hip pain" and reported that the "last few physical therapy treatments caused" nausea. Dr. Julian noted, "Physical examination essentially unchanged, and that was the last examination."

After August, 1967, Mrs. Hulsey discontinued her visits to Dr. Julian. The record reveals a report to counsel who represented Mrs. Hulsey in the trial of this cause from a doctor who examined Mrs. Hulsey at Scott and White Clinic in Temple in August, 1967. This report shows that X-rays of the cervical spine and of the right elbow and right hip "were unremarkable." The doctor concluded that her symptoms were "all secondary to post-traumatic cervical strain," and recommended Mrs. Hulsey "stop the things which are aggravating her symptoms, avoid traction, heat and massage for a while just to see if they are aggravating everything, and to try to live as normal as she can." The doctor further concluded, "I do not think that at the present time the patient has any findings of a protruded disc but I think we will have to see she does without all of the things which tend to aggravate her."

Mrs. Hulsey testified that in January of 1967 she had had a fall in her home and that about a week later while pulling on a girdle she experienced sharp pain in her neck. The record also shows that Mrs. Hulsey fainted and fell at work in September, 1967.

After being examined at Temple in August, 1967, and by Dr. Farris in October of that year, Mrs. Hulsey next was examined in neurosurgery clinic at Lackland Air Force Base, near San Antonio, in February of 1968, two years after the accident. Electromyelogram examination was negative. Dr. Ashley, the examining doctor, reported he found "no evidence of nerve root compromise," no muscle spasm, and no genuine weakness of the arm. The examining doctor concluded, "Her symptoms are primarily subjective."

Later in 1968, in the month of July, Mrs. Hulsey underwent an operation for severe vaginitis and removal of her cervix, the vaginitis being an affliction Mrs. Hulsey testified she had suffered from, "Approximately a four to five-year period prior to that."

In the early part of 1969, approximately three years after the accident, Mrs. Hulsey was examined at Lackland Air Force Base by Dr. James Henry Reiss who subsequently performed an operation on Mrs. Hulsey's neck. Dr. Reiss testified, "We feel that the patient has been cured of her complaint."

Dr. Reiss further testified:

"Q [Counsel] Doctor, if a person, in particular, a forty-year-old lady was involved in an automobile accident during which she felt or heard a popping in her neck and incurred pain shortly thereafter, which pain continued for three years, and at the end of the three years had an operation on her neck which relieved that pain, would you say that in all medical probability the accident caused the necessity of the operation?

"A [Dr. Reiss] In my medical opinion, yes."

On cross examination Dr. Reiss testified:

"Q Now, in order to determine in * * * the case of Mrs. Hulsey * * * what caused a condition you never saw or didn't find till February, 1969, you

would have to rely on history, would you not; in other words, you would have to rely on what she told you was the history of her complaints and treatments and findings up until February, 1969, in order to form an opinion as to what caused that condition?

"A    Absolutely correct.

　　*　　*　　*　　*　　*　　*

"Q    So when you have testified　*　*　* that in all medical probability this accident caused the condition you found on operation, that is based solely on the history?

"A    That is based specifically on the history, on the statement that Mrs. Hulsey had her pain develop immediately following the accident, correct."

Dr. Reiss repeatedly testified that his medical opinion, that the automobile accident caused the condition he found in Mrs. Hulsey's neck, could not be given without relying upon the history given him by Mrs. Hulsey and that if the history proved inaccurate, the validity of his opinion would be affected. Dr. Reiss stated that the neck condition of Mrs. Hulsey could have developed gradually over a period of time from unknown causes or could have developed more rapidly by trauma, such as a fall.

Dr. Reiss recognized both Dr. Farris and Dr. Ashley as competent neurosurgeons and testified that medical opinions differ, as was shown by the fact that Dr. Farris' opinions in 1966 and 1967 and the opinion of Dr. Ashley in 1968 were contrary to the medical opinion of Dr. Reiss in 1969 and at the trial.

The record does not disclose that Mrs. Hulsey missed days from work because of the neck complaints, although it is undisputed she was away from work because of her various other ailments. From the time of the accident to the time of trial Mrs. Hulsey received increases in pay, as well as promotions, in her work.

Appellants contend that "since defendant did not offer, and no issue was submitted, inquiring if plaintiff did in fact sustain injuries on the occasion in question ‘ * * * *defendant has waived this theory* as a rationale for the jury's refusal to award plaintiff any recovery for the pain and suffering shown in the evidence.' " (Emphasis supplied).  In taking this position appellants rely upon the holding in Texas and Pacific Railway Co. v. Van Zandt, 159 Tex. 178, 317 S.W.2d 528 (1958).

We do not understand the holding in Van Zandt to prevent the defendant, on appeal, from contending that plaintiff failed in the trial to show that injury actually resulted from the event plaintiff alleged was the cause of injury.  In Van Zandt a single special issue was refused by the trial court, although requested, where the pleadings and the evidence raised the question of injury resulting from the collision which plaintiff pleaded was the cause of injury. The Supreme Court held that the issue should have been submitted and failure to submit it, except incidentally in the damage issue, was reasonably calculated to cause and did cause rendition of an improper judgment requiring reversal.

In 1965, in refusing application for writ of error, with notation of no reversible error, the Supreme Court disapproved the holding of a court of civil appeals that " * * *  when raised by the evidence, the issue of whether　*　*　* plaintiff has sustained an injury is a ‘defendant's issue' within the meaning of Rule 279, Texas Rules of Civil Procedure." (Brown v. Poff, 392 S.W.2d 113, Tex.Sup.Ct.1965).

Rule 279 provides that "upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived * * *." The Supreme Court stated, "There is a marked distinction between the term ‘defendant's issue' as generally used with Rule 279 and the term ‘vital defensive issue', as used in Texas & Pacific Ry. Co. v. Van Zandt, 159 Tex. 178, 317 S.W.2d 528."

In the cause before us, the jury was asked, in the usual damage issues submitted in

personal injury cases, (1) what would reasonably compensate plaintiffs for physical pain and mental anguish sustained by Mrs. Hulsey resulting from injury sustained in the collision, (2) what would compensate for her reduced capacity to earn money resulting from injury sustained in the collision, and (3) what value were hospital and medical services rendered Mrs. Hulsey in the operation performed on her neck at Lackland in 1969 as a result of injury in the collision.

The jury answered each of the issues unfavorably to appellants, thus in effect finding that Mrs. Hulsey did not, as a result of injury sustained in the collision, experience pain and mental anguish or loss of earning capacity, and that the medical and hospital services rendered her at Lackland by United States Air Force doctors and facilities were not for an injury sustained by her in the collision.

■ The burden was on plaintiffs to prove that Mrs. Hulsey had been injured. Whether there was injury in the collision was put in issue by defendant's general denial. The evidence shows that the question was in issue throughout the trial. Defendant's failure to request a single submission of the question of injury does not result in waiver of his right on appeal to contend that the evidence sustains the findings of the jury on damages and that the findings are not against the great weight and preponderance of the evidence. Royal v. Cameron, 382 S.W.2d 335 (Tex.Civ.App., Tyler, 1964, writ ref., n. r. e.); Hoffman v. French, Ltd., 394 S.W.2d 259 (Tex.Civ. App., Corpus Christi, 1965, writ ref. n. r. e.).

The case plaintiffs presented in the trial depended largely upon the testimony of Mrs. Hulsey and upon her subjective complaints. Four doctors who examined Mrs. Hulsey found no evidence of injury. The last doctor who saw her three years following the collision found need for an operation and did operate, but his opinion that her troubles had their origin in an injury received in the automobile collision depended upon the accuracy of Mrs. Hulsey's account of her history. The doctor did not have the benefit of all her medical records until after the operation when he was asked to review the records as a prospective witness at the trial. The doctor who operated more than three years after the collision was the only attending physician who made objective findings from examinations and tests.

The collision was minor, as shown by the limited damage to the two automobiles. The Drake car was moving slowly when it struck the rear of the Hulsey vehicle. Only Mrs. Hulsey, of the four persons in her car, complained of injury of any consequence. Mrs. Hulsey told the police officer she felt a pop in her neck but refused medical attention. She waited nine days before consulting a doctor about her neck, although she testified that four days after the collision she could not eat and that next day at work, the fifth day, the pain really began to get to her. Meanwhile she had seen doctors on two occasions for other complaints without mentioning the pain in her neck resulting from the collision.

Mrs. Hulsey's medical history, during the months she was seeing Drs. Julian, Farris, and Ashley, and the doctor at Scott and White, reveals a patient with continued symptoms for which no doctor could find a clinical basis, although repeated examinations were made in an effort to establish objectively the cause of the discomfort she reported having. At least three doctors found or suggested that tension, panic, or aggravating matters were associated with her symptoms, which Dr. Farris said were disproportionate to their gravity. The cervical degenerative disc disease mentioned by Dr. Farris was described by both Dr. Julian and Dr. Reiss as an affliction frequently associated with mature years and normal wear and tear on the human body and not necessarily resulting from injury. Mrs. Hulsey continued working from the time

of the accident without interruption except for ailments other than her neck problem, and received repeated advancements in pay and work status.

Appellants' trial counsel (whose death occurred before hearing on appeal) in explaining to the jury why trial had been delayed more than three years following the collision, made this statement during trial:

"I was attempting to get Mrs. Hulsey to explain that we had not gone to trial in this case before for the reason that nobody had been able to find her problem, pinpoint it and prove that it was there, and decided to wait until after somebody did find it, hopefully somebody would find it, and after they found it, then we could go in and prove that there was an injury and not just the contention that my head hurts and my neck hurts, and that would have been her answer today."

In arriving at the conclusion that Mrs. Hulsey did not suffer physical pain and mental anguish as result of an injury sustained in the collision, the jury may well have considered that whatever disability Mrs. Hulsey related and whatever involvements Dr. Reiss disclosed were not reasonably and proximately caused by the collision.

■■ It is settled law that the jury may reject all or any of the theories of doctors concerning their views as to the pain and suffering sustained by the plaintiff on account of her claimed injuries, and the jury may determine the credibility of any of the witnesses and the weight to be given their testimony. The burden is on appellants to show that the verdict is contrary to the overwhelming preponderance of the evidence, and in passing on this point the appellate court will consider the whole record, will not substitute its judgment for that of the jury, but will determine whether the jury's findings are so against the weight and preponderance of the evidence as to be manifestly unjust or clearly wrong. Royal

v. Cameron, 382 S.W.2d 335 (Tex.Civ.App., Tyler, 1964, writ ref. n. r. e.); Bardwell v. Anderson, 325 S.W.2d 929 (Tex.Civ.App., Houston (1), 1959, writ ref. n. r. e.), and authorities cited in these cases.

■ After considering the whole record, we cannot say that the answers of the jury to the special issues of which appellants complain are so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust or clearly wrong. The jury's answers to other issues not here complained of, and not heretofore mentioned, were uniformly unfavorable to appellants in findings that there was no loss of Mrs. Hulsey's services to her spouse, no loss of consortium, and no loss of future wage increases.

Appellants urge that the agreement of counsel for the parties upon an answer to Special Issue No. 27, pertaining to cost of medical services, after the jury had advised the trial court that all issues had been agreed upon except that issue, " * * * and the overwhelming weight of the evidence * * * show that the only issue before the jury was the nature and extent of the injuries sustained and not whether or not any injury was in fact received * * *" in the collision. We do not agree with this conclusion. The answer the attorneys agreed upon to the special issue was based on several stipulations entered into during the trial by which it was agreed that if the several doctors and medical personnel were present they would testify to the amount of their statements for services and would say that the charges were reasonable.

■ We are unwilling to read into the agreement between counsel as to an answer for Special Issue No. 27 an additional agreement on the part of counsel for appellee that Mrs. Hulsey had in fact received injury in the collision. At most the agreement as to the amount of medical expenses was no more than a basis for compromise and settlement even if the jury found

against the appellants on the issues answered.

The judgment of the trial court is in all things affirmed.

Affirmed.