**GREAT AMERICAN INSURANCE COMPANY, Petitioner,**

v.

**SHARPSTOWN STATE·BANK, Respondent.**

**No. B–1620.**

Supreme Court of Texas.

Oct. 7, 1970.

Rehearing Denied Dec. 9, 1970.

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Thomas G. Gee, Austin, Barrow, Bland & Rehmet, David Bland, Houston, for petitioner.

Kendall, Koch, Randle, Finch & Osborn, Gaynor Kendall, Austin, for respondent.

GREENHILL, Justice.

This is a suit by Sharpstown State Bank on two promissory notes totaling $470,000, and on "note guaranty" bonds issued by the Petitioner, the Great American Insurance Company, guaranteeing the payment of the notes. Summary judgment was entered for the bank against the makers of the notes. No appeal was taken by the makers of the notes, and that matter is not before us.

What is before us is this: In the action against the Great American Insurance Company on the bonds, the insurance company defended on the grounds that the bonds were not issued by it; i. e., that the bonds were not (1) signed by anyone with actual or apparent authority nor (2) delivered to Sharpstown by anyone with actual or apparent authority. Trial was to a jury. On a verdict for Great American on the issue of apparent authority,[1] the trial court rendered a judgment that Sharpstown take nothing. The Court of Civil Appeals reversed the trial court's judgment as to Great American.

The Court of Civil Appeals held that there was no evidence to support the jury's findings of lack of apparent authority, and that there was apparent authority as a matter of law. It rendered judgment for the Sharpstown Bank against Great American on the bonds. 441 S.W.2d 548. We reverse the judgment of the Court of Civil Appeals. We hold that the verdict of the jury is supported by some evidence; but since one of the points which that court did not decide is within its exclusive jurisdiction and may control the final judgment herein, we remand the cause to the Court of Civil Appeals for a consideration of that point.[2]

The background of the case is as follows:

Frank Sharp, majority stockholder and Chairman of the Board of the Sharpstown State Bank, and two other men, William Nathan and Lee Wiley, were partners in a business transaction. The transaction was arranged with the apparent expectation that each of the three men would eventually own a one-third interest in a sizeable amount of stock of California Financial Corporation, a substantial financial conglomerate listed on the New York Stock Exchange.

Wiley was to borrow $300,000 from a bank other than Sharp's, the Central National, to furnish the initial cost consideration for the transaction. If Wiley's debt' was unpaid at the end of six months, Sharpstown State Bank would make Wiley a $100,000 loan, and Oak Forest Bank, which Sharp also controlled through a majority ownership of the stock, would lend Wiley the remaining $200,000. Central National also required that $600,000, twice the amount of the loan to Wiley, be maintained on deposit with it by the Sharp-controlled banks for the entire duration of this loan. Charles McLean, president of Sharpstown, was aware of these maneuvers and disapproved of them, but he felt helpless to dispute Sharp.

While Wiley was the man to furnish the cash consideration, Nathan's part of the deal was to contract to purchase the California Financial stock and to execute any notes required. Soon after Nathan had tied up the stock as planned, Frank Sharp, the man who was seeing that Wiley would be able to get the loans for the venture, decided that he wanted out, and he instructed Nathan and Wiley to get him out. Nathan then began to look for a purchaser of the consummated transaction.

After some time, Nathan found Commercial Investment Fund of Los Angeles as a possible purchaser of the stock positions held by Sharp, Nathan and Wiley. Apparently Commercial Investment Fund was quite willing to purchase the stock position in California Financial if it could obtain the necessary funds.

Nathan, who was highly desirous of helping Commercial find the necessary funds, consulted with Charles McLean. Nathan described to McLean what had transpired and told McLean that Commercial wanted a $470,000 loan, $300,000 to purchase the stock contracts held in the name of Nathan

---

1. The plaintiff bank appears to have conceded want of actual authority, and no issues were requested or submitted on that ground.

2. Vasquez v. Meaders, 156 Tex. 28, 291 S.W.2d 926 (1956); Hale v. Texas Employers' Ins. Assn., 150 Tex. 215, 239 S.W.2d 608 (1951).

and his company, the Mayfair Investment Corporation, and an additional $170,000 for expenses of the transactions. Nathan stated that Commercial would provide a performance bond if Sharpstown would lend Commercial the money. Nathan further told McLean that the bond would be one written by an "A plus 5–A" company, or in other words, the strongest company rated. Nathan told McLean that a similar loan had recently been arranged with a certain California bank. McLean called the California bank, and an officer there named Gould confirmed that they were contemplating making a loan secured by a performance bond, though the loan had not been consummated. McLean apparently called Gould since a bank loan secured by a performance bond was a highly unusual transaction, as will be later developed, and one which none of the banking experts who testified had ever heard of prior to this transaction.

McLean went to Frank Sharp and told Sharp what Nathan had told him, McLean. Not surprisingly, Sharp agreed that if the promised bond were presented, there was no reason why Sharpstown could not make the loan.

On October 18, Nathan furnished McLean with a blank specimen of the type bond which Commercial would furnish, but with no insurance company listed as surety. McLean wrote the bank's attorney for advice as to the sufficiency of the wording of the bond. The attorney replied that the bond should be made payable in Harris County, and was otherwise sufficient.

At this time, Nathan also furnished McLean with a financial statement, supposedly prepared by a certified public accounting firm in Los Angeles, showing Commercial's net worth to be $11,000,000. McLean subsequently called Dun & Bradstreet for a credit report on Commercial and received an unusual report,—that no information could be released on Commercial as it had threatened Dun & Bradstreet with a lawsuit in this event.

On November 4, a man named Luftig and two other men, all described by McLean as looking like promoters, came to McLean and signed a note for Commercial payable to Sharpstown. Luftig was, or claimed to be, the president of Commercial, and he produced its corporate resolution showing that he had authority to borrow money on its behalf. Luftig left for California with the agreement that the bonds would be shortly forthcoming. The note was not to be effective until the bonds arrived.

Weeks passed and no bonds came, and McLean became convinced that none would come.

Toward the end of November, Nathan and a man named Bill Skillman, who identified himself as an insurance broker from Kansas City, told McLean that Great American was to be the surety on the bonds. December 8 was the date set for the delivery of the bonds. Meanwhile, McLean got a rating on Great American from his local insurance man which confirmed it as "A plus 5–A." He also called Great American's local agent to ask who had authority to sign bonds out of the Kansas City regional office.

On December 8 at 4:30 in the afternoon, Nathan, Luftig, Skillman, a person named Predovich, and a man named Gilbert Bartling came into McLean's office. Skillman was identified as the broker on the bond, and Bartling was presented as a general agent of Great American from Kansas City. Bartling had two bonds in his possession for $300,000 and $170,000, both with attached powers of attorney and acknowledgments or jurats. Bartling presented the bonds to McLean who, he testified, read them in toto.

The bonds were signed by Curtis J. Bohannon as attorney in fact. It is apparent in the record that McLean had been concerned about forgery, as he had not seen Bohannon sign the bonds. But he found the corporate seal impressed through Bohannon's signature and a jurat to the

effect that Bohannon was known to the notary personally and as an attorney in fact for Great American. McLean was thus satisfied that Bohannon signed the bonds.

McLean next read the attached power of attorney to see whether Bohannon had any authority to sign the bonds in question. The power of attorney recited that certain persons, one of whom was Bohannon, had authority to execute on behalf of the company *any and all* bonds and contracts of suretyship. Under the heading of limit of powers was written "all unlimited." The power of attorney was signed by a vice-president of Great American and also by the secretary. There was also a notarized certificate which authorized the named vice-president to appoint persons with power of attorney. Also attached were by-laws of Great American authorizing the president and vice-presidents to appoint persons with power of attorney, and resolutions of the board of directors to the same effect. All documents were acknowledged and impressed with the corporate seal. Finally there was a certificate dated December 7 to the effect that the powers granted had not been revoked.

From the foregoing, McLean testified that he supposed Bohannon, who was not present, had authority to sign the bonds in question, and that he assumed that Bartling's possession of the signed, sealed, and delivered bonds evidenced his authority to deliver the bonds.

McLean was disturbed that there were some wording changes from the specimen bond he had been furnished; so he called and read the bond to his attorney. He again received the same advice: to make the bonds payable in Harris County, and it would be all right. Bartling was agreeable to the change, and the change was made on his authority.

McLean, remembering the "blank wall" he had met in seeking credit information on Commercial, remained anxious; and he inquired of Bartling how Great American could make such a loan without credit in-

formation. Bartling responded with a story about a prominent California family which had secured the transaction to Great American with government bonds, but that they would not do so directly to the bank because they did not want their name connected with it. McLean testified that this explanation satisfied him, although on cross examination, he admitted that it sounded "pretty silly."

Immediately thereafter it occurred to McLean that the surety bonds would not cover the payment of interest since the face value of the bonds equalled the indebtedness. McLean talked to Sharp and both agreed to trust the makers for the interest.

Thereafter two notes were drawn, for $300,000 and $170,000, for execution by Nathan and Commercial of one note and by Nathan and Mayfair of the other. The respective makers signed the notes and pledged their stock as collateral. The $470,000 was credited to Mayfair's account, and the bonds in question were accepted, making Great American, in form, jointly and severally liable along with the above-mentioned makers.

Thereafter Nathan wrote a check on Mayfair's account payable to the bank for $23,500 as "premium on the bonds." This check was given to pay a cashier's check which was prepared payable to Continental Investment Bankers at the request of Skillman. Skillman then endorsed the check and asked McLean if he would guarantee the signature. McLean replied that he would not since he did not know whether Skillman had authority to endorse a check to Continental. He did, however, write on the back of the check that Skillman signed in McLean's presence. Skillman turned the endorsed check over to Bartling, and Bartling left McLean's office. The closing of the entire transaction was concluded by about 7:00 or 7:30 that evening.

As noted earlier, the trial court rendered an interlocutory summary judgment against Nathan, Mayfair and Commercial as makers of the two notes in question. After

a lengthy trial on the question of Great American's liability on the bonds, the case went to the jury on the following special issues and instructions; and the following answers were given.

## "SPECIAL ISSUE NO. 1

"Do you find * * * that Curtis J. Bohannon had apparent authority from Great American Insurance Company to sign the bonds (Plaintiff's Exhibits No's. 2 and 5)?

"The term 'apparent authority' means such authority as a reasonably prudent person, situated as were the officers of plaintiff bank, using diligence and discretion, in view of the conduct, if any, of Great American Insurance Company, would naturally and reasonably suppose Curtis J. Bohannon to possess at the time of the closing of the loans."

The jury answered: No.

## "SPECIAL ISSUE NO. 2

"Do you find * * * that Curtis J. Bohannon signed such bonds?"

The jury answered: Yes.

"If you have answered Special Issue No. 1 'Yes', you will answer the following special issue; otherwise you will not answer it."

## "SPECIAL ISSUE NO. 3

"Do you find * * * that, in accepting the bonds and making the loans, plaintiff bank in good faith relied upon such apparent authority, if any, of Curtis J. Bohannon to sign such bonds?"

This issue was not answered.

## "SPECIAL ISSUE NO. 4

"Do you find * * * that Gilbert Bartling, Jr., had apparent authority from Great American Insurance Company to deliver such bonds to plaintiff bank in Houston?

"The term 'apparent authority' means such authority as a reasonably prudent person, situated as were the officers of plaintiff bank, using diligence and discretion, in view of the conduct, if any, of Great American Insurance Company, would naturally and reasonably suppose Gilbert Bartling, Jr., to possess at the time of the closing of the loans."

The jury answered this: No.

"If you have answered the foregoing special issue 'Yes', you will answer the following special issue: otherwise, you will not answer it."

## "SPECIAL ISSUE NO. 5

"Do you find * * * that, in accepting the bonds and making the loans, plaintiff bank in good faith relied upon such apparent authority, if any, of Gilbert Bartling, Jr., to deliver such bonds?"

The jury did not answer this issue.

■ The jury thus returned an affirmative verdict on special issue two, finding that Bohannon did sign the bonds; but it also refused to find that either he or Bartling had apparent authority, Bohannon to sign, and Bartling to deliver, the bonds. As instructed by the court's charge in this contingency, the jury returned no verdict on the conditionally submitted issues concerning good faith reliance by the bank officials on the appearances.

The plaintiff Sharpstown timely moved to disregard the answers to special issues one and four, the apparent authority issues. The trial court disregarded the answer to special issue number one as without any support in the evidence, but refused to disregard the answer to special issue number four that Bartling did not have apparent authority. Judgment was then rendered against Nathan, Commercial and Mayfair as makers. But because of the verdict on issue number four, the judgment was that Sharpstown take nothing against Great American on the bonds. As stated, the Court of Civil Appeals reversed, holding

that the apparent authority of Bohannon to execute, and of Bartling to deliver, the bonds was established as a matter of law by the uncontroverted evidence; and it rendered judgment against Great American.

We shall assume that there is evidence to support the verdict and holding as to the apparent authority of Bohannon to sign the bonds. We are then met with the question whether the Court of Civil Appeals correctly held the evidence to establish conclusively the apparent authority of Bartling to consummate the bonding transaction by final arrangements, including alteration and delivery of the bonds. This is the keystone of the opinion below: If it is in error, the cause must be reversed. We have concluded that it must be. There is evidence in the record upon which reasonable men could determine that the conduct of Sharpstown's officials fell short of reasonable prudence, diligence and discretion in the circumstances. Great American Cas. Co. v. Eichelberger, 37 S.W.2d 1050 (Tex.Civ.App.1931, writ refused).

The circumstances of the entire bonding transaction were highly unusual, and were known to be such by Charles McLean, Sharpstown's president and the officer primarily responsible for the handling of the loan. The security proposed for the loan, a performance bond, was unique in his experience and in that of the experienced banking witnesses who testified. McLean was aware that it would be highly unusual for a surety company to issue such a bond and had, as he testified, never heard of one before in his 40 years of banking experience. Despite this fact, his investigation of Commercial Investment Fund, the primary borrower, was cursory and inconclusive, unaccountably terminating with the receipt of the "no comment" credit report from Dun & Bradstreet noted above.

Bartling, the sole purported representative of Great American with whom McLean dealt, was unknown to McLean before the evening of the closing. He neither bore, nor did McLean have from any other source, any warrant from Great American as to his *own* capacity to act for it, nor did McLean make any investigation of Bartling's authority. These factors, without more, have been held sufficient to negative apparent authority in a well-reasoned opinion on similar facts. National Surety Corporation v. Inland Properties, Inc., 286 F.Supp. 173 (D.C.1968), affirmed, Per Curiam, 416 F.2d 457 (8 Cir. 1969).

Moreover, the transaction as presented to McLean involved, to his admitted knowledge, substantial departures from the usual methods of conducting business, and the circumstances leading up to it were sufficiently suspicious to arouse in McLean admitted fears of forgery. Specifically, he doubted the capacity to act in some respects of those with whom he was dealing, and he so testified. In these circumstances, the jury's conclusion that Bartling's apparent authority was not established was supported by some evidence. See Kamen & Co. v. Paul H. Aschkar & Company, 382 F.2d 689 (9th Cir. 1967); In re Union City Milk Co., 329 Mich. 506, 46 N.W.2d 361 (1951); Restatement of Agency, Second, § 166, Comment (a), page 393: "Any substantial departure by an agent from the usual methods of conducting business is ordinarily a sufficient warning of lack of authorization."

There are other grounds submitted for a reversal and remand of this cause, but it is not necessary to reach them in view of our disposition of the case. Having considered and disposed of the grounds upon which the court below rested its judgment, we have examined the plaintiff's other points before that court to determine whether any not considered by the court below would lead us to an affirmance of its judgment, which was a reversal and rendition. Each of the plaintiff's other points below is such that a sustaining of it would result in an alteration of the judgment of the Court of Civil Appeals. None having been brought for-

ward by cross-points, they have passed from this appeal. See Calvert, Some Problems of Supreme Court Review, 21 Texas Bar Journal 75 at 113 (1958).

As the conclusive evidence holding of the court below results from erroneous concepts of law, we have concluded that the interest of justice would be best served by a remand to that court for a consideration of plaintiff's point two in the Court of Civil Appeals. That point raised the question as to the sufficiency of the evidence to support the jury's answer to special issue four upon which the judgment of the trial court rested, i. e., the lack of apparent authority. Accordingly, the judgment of the Court of Civil Appeals is reversed, and the cause is remanded to that court.