**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver of Sharpstown State Bank, Appellant,**

v.

**GREAT AMERICAN INSURANCE COMPANY et al., Appellees.**

No. 11664.

Court of Civil Appeals of Texas, Austin.

June 30, 1971.

Rehearing Denied July 21, 1971.

Strasburger, Price, Kelton, Martin & Unis, Royal H. Brin, Jr., Dallas, Kendall, Koch, Randle, Finch & Osborn, Gaynor Kendall, Austin, Baker & Botts, Houston, Redford J. Wedel, Acting Gen. Counsel, F. D. I. C., Washington, D. C., for appellant.

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Thomas G. Gee, Austin, Barrow, Bland & Rehmet, David Bland, Houston, for appellees.

O'QUINN, Justice.

In our first consideration of this case in 1969 we held that there was no evidence to support the jury's finding that Gilbert Bartling, Jr. did not have apparent authority from Great American Insurance Company to deliver two surety bonds to Sharpstown State Bank in Houston, and that there was apparent authority as a matter of law. Tex.Civ.App., 441 S.W.2d 548, 564.

The Supreme Court disagreed and held that the jury's finding was supported by some evidence. Tex.Sup., 460 S.W.2d 117. The case was remanded to this Court "since one of the points * * * [this Court] did not decide is within * * * exclusive jurisdiction [of this Court] and may control the final judgment herein * * *" 460 S.W.2d 118, col. 1.

Our consideration of the case on remand is limited to the single point of error originally brought by Sharpstown State Bank, in substance as follows:

"* * * the judgment [of the trial court] should be reversed and the cause remanded because the answer of the jury to Special Issue 4, on which the take-nothing judgment rests, is contrary to the overwhelming weight and preponderance of the evidence."

After the case was remanded by the Supreme Court in 1970, the directors of the Sharpstown State Bank in 1971 closed the bank, and the Federal Deposit Insurance Corporation, as the receiver appointed to liquidate the institution's affairs, is now before us as appellant (plaintiff) in the cause.

The scope of our review is defined by In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951), in which the Supreme Court stated that "in the exercise of its peculiar powers under the constitution and Texas Rules of Civil Procedure Nos. 451, 453, and 455," a Court of Civil Appeals is required "to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new

trial" if the court "concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust * * * regardless of whether the record contains some 'evidence of probative force' in support of the verdict."

In following the rule, this Court stated in Hulsey v. Drake, Tex.Civ.App., 457 S.W.2d 453, 460 (1970, writ ref. n.r.e.) that:

"The burden is on appellants to show that the verdict is contrary to the overwhelming preponderance of the evidence, and in passing on this point the appellate court will consider the whole record, will not substitute its judgment for that of the jury, but will determine whether the jury's findings are so against the weight and preponderance of the evidence as to be manifestly unjust or clearly wrong."

■ In a case such as the one before us, in which the Supreme Court has found that there is some evidence to support a finding and has remanded the cause to the Court of Civil Appeals for consideration of "insufficient evidence" points, the Supreme Court has emphasized that the final decision lies with the intermediate appellate court and that the Supreme Court's holding on the law question of "no evidence" should not impede the court of civil appeals in evaluating fact questions of "insufficient evidence." Stanfield v. O'Boyle, 462 S.W.2d 270 (Tex.Sup.1971).

In Stanfield the Supreme Court said: "If, in light of our analysis of the evidence and its mature consideration thereof, the court of civil appeals should conclude that the evidence is factually insufficient to support the trial court's vital fact findings, it should have no hesitancy in reversing the trial court's judgment and remanding the case for retrial. What we have said on the law question of 'no evidence' should be no impediment and no source of embarrassment to the court of civil appeals' own proper evaluation of the evidence on the fact questions of 'insufficient evidence' inasmuch as that court and that court alone

is made the final arbiter of that question." 462 S.W.2d 273.

The facts of this case have been fully stated by this Court (441 S.W.2d, at pp. 552–562), and by the Supreme Court to the extent necessary to measure whether there was any evidence to support the jury's finding under Special Issue No. 4 (460 S.W.2d, at pp. 118–121).

This Court's discussion of the facts related to the authority of Bartling was set out in 441 S.W.2d, at page 562, column 2, through page 563, followed by our conclusions, found in the first two paragraphs on page 564, column 1.

It is clear that in applying the rule by which we are guided, in reviewing the record to determine whether the jury's finding was against the weight and preponderance of the evidence, we must look at the facts which the Supreme Court found to be some evidence under the law question and weigh with these facts all additional evidence relating to whether "reasonable men could determine that the conduct of * * * [the bank's officers] fell short of reasonable prudence, diligence and discretion in the circumstances." (460 S.W.2d 122, col. 1)

Charles McLean, at the time of the bonding transaction, was president of the bank and the officer primarily responsible for handling the loan. Because McLean, in his forty years of banking experience, had never heard of using a performance bond as security for a loan, he sent a specimen copy of the proposed bond to Will Wilson, the bank's attorney, at Austin and by accompanying letter asked the attorney to examine the language of the bond and advise what was required to make the bond legal in Texas. Wilson advised McLean that such bonds were legal and that the suggested language of the bond was all right, but that the place of payment, for purposes of venue, should be changed to Harris County.

Upon learning, about a week before closing of the loan, that the proposed bond was

to be written by Great American Insurance Company, out of its regional office in Kansas City, McLean called the local office of Great American in Houston to ascertain what person was authorized to execute such surety bonds. McLean was told that the Houston office did not have such information but did have the name of the regional manager, Lynn Gregg, in Kansas City. McLean learned from Best's ratings that Great American was one of the largest companies in the insurance business.

The record shows that Great American does in fact write guaranty bonds securing notes, although infrequently. When the bonds were tendered by Bartling, on the occasion of closing the loan, McLean satisfied himself on several points. First, the bonds bore the signature of Curtis J. Bohannon as attorney-in-fact for Great American; second, the seal of Great American had been manually impressed through the signature; third, Bohannon had acknowledged, before a notary public who certified Bohannon was known to her, that he executed the bond in his capacity as attorney-in-fact as the act and deed of Great American; fourth, attached to the bonds was Bohannon's power of attorney, certifying that he had been appointed, along with Lynn Gregg, by Great American as attorney-in-fact with power to write any and all kinds of surety bonds in unlimited dollar amounts.

Admittedly the power of attorney was genuine, although by private communication, not made known until long after the facts of this case, Bohannon's authority had been limited in some aspects by Great American.

When McLean noted that the bonds tendered for delivery varied in some detail from the specimen previously approved by the bank's attorney, he called Will Wilson at Austin and had the bond read to him. In addition, McLean's secretary read the bond to Wilson's secretary so that Wilson could have the language before him in written form. Thirty minutes later Wilson called McLean and suggested only that the place of payment, as previously suggested, should be made in Harris County. Before accepting the bonds, McLean discussed this change with Bartling who was agreeable, and the change was typed in the bond.

McLean, finding at the outset that bonds of this type were unique in his experience, nevertheless twice consulted the bank's attorney, who advised that such bonds were legal and were in acceptable form and language. In addition, McLean satisfied himself when the bonds were tendered, that Bohannon acted under a genuine power of attorney from Great American, executed by its highest officers, authorizing Bohannon to act for the company in executing any and all kinds of surety bonds without limitation as to the amount.

The Supreme Court characterized McLean's investigation of Commercial Investment Fund, the primary borrower, as "cursory and inconclusive", culminating in a "no comment" credit report from Dun and Bradstreet, despite the fact that to McLean a surety bond as security for a bank loan was unusual.

Commercial Investment Fund was but one of three borrowers in the transaction. The loan was to be made to William Nathan, an individual who was a resident of Texas, to Mayfair Investment Company, a Texas corporation, and to Commercial Investment, a Nevada corporation. McLean knew that his bank had done business previously with Mayfair and Nathan, but took the position that he probably would not have been willing to lend to Nathan and Mayfair in the sums of money involved (two notes, $300,000 and $170,000) in the pending transaction without security. After failing to obtain a satisfactory credit report on Commercial Investment, McLean was convinced that bonds to secure the notes, which Nathan had suggested, would not be forthcoming. McLean decided that in any event he would not make the loan without the adequate security such as the bonds would supply.

The bonds subsequently proffered were payable to the bank alone as the obligee, to secure the very loans proposed to be made to the identical individual and corporations, all in conformity with the loan transaction that had been under discussion for several weeks. The bonds could be used to the benefit of only the parties named in the bonds, and in connection only with the loan transaction the named parties had been negotiating. The bonds were written on manuscript bond paper printed especially by Great American for contracts of an unusual type. As noted, the bonds bore Great American's seal, impressed manually upon the signature of Bohannon, the undisputed attorney-in-fact of the surety company, shown by attachments to the bonds to have been entrusted with power of attorney, supported by appropriate resolutions of the board of directors, authorizing Bohannon to sign and deliver on behalf of Great American any kind of surety bond in an unlimited dollar amount.

Although one of the three borrowers, Commercial Investment, was of questionable credit standing, this circumstance did not point to Bohannon's dishonesty and betrayal of his employer, Great American. On the contrary, everything McLean had in his hands, the bonds and their authenticating papers, demonstrated that Great American trusted Bohannon and had so certified.

To say that McLean imprudently accepted Bartling as the agent to deliver the bonds would require that McLean suspect Bohannon of defrauding Great American, despite the admitted genuineness of his authority attached to the bonds, and to conclude that Bartling was a conspirator with Bohannon in the deception; further, such finding of imprudence would require that McLean infer or suspect that the officers of Great American who executed Bohannon's power of attorney purposely overstated, or misstated, the scope of Bohannon's power to act for the company. The record shows that such were the facts, but the facts were made possible by Great American, acting through its officers and agents, and, under the circumstances, a finding that Bartling arrived without apparent authority to deliver the two bonds the parties had talked about for a month or more is against the weight and preponderance of the evidence.

Affirmative showing of McLean's prudence and caution under the circumstances is found in his questioning of Bartling as to why Great American was willing to make the bond. McLean apparently assumed that the surety company would not write the bonds without adequate collateral security from the borrowers, since he asked Bartling how the company could afford to write bonds securing notes of a new company such as Commercial Investment on which McLean had been unable to obtain credit information. Bartling told McLean that Great American had adequate collateral furnished by a California family that wished not to be identified in the loan transaction. Although McLean later, in looking back at the matter, admitted that Bartling's explanation appeared "pretty silly," he testified also that at the time of the transaction Bartling's statement "completely disarmed" him. Bartling, like Bohannon, was an agent often acting for Great American, but his statement to McLean had nothing to do with his authority as an agent, and McLean was entitled to rely on Bartling's other representations made in the course of the loan transaction.

Prior to the closing of the loan transaction McLean had had no direct dealings with Bohannon in Kansas City. Bartling was the first, and only, agent of Great American that McLean dealt with in connection with the loan matter before it was closed, and until the day of closing McLean had not known Bartling. Bartling did not present to McLean any evidence of his own capacity to act in delivering the bonds, and McLean made no investigation of Bartling's authority.

It is undisputed that, within three business days following close of the loan,

McLean attempted to talk to Bohannon in Kansas City to request excerpts from Great American's by-laws authorizing security bonds of this type, so that the information could be passed on to another Houston bank interested in buying participation in the loan. McLean was told that Bohannon was at lunch, and McLean asked to talk to Lynn Gregg, the regional manager whose name McLean had earlier obtained from Great American's Houston office. Gregg in effect said that McLean would have to talk to Bohannon who was more conversant with, and was in charge of, bond matters in that office, adding that he would have Bohannon call McLean.

Later the same day Bohannon called McLean, saying that Gregg had told him of McLean's earlier call, and explained to McLean that the excerpts needed were handled through Bartling, "our general agent," who would supply the material needed. Not having heard from Bartling, McLean two days later called Bartling directly and was told by Bartling that it might be necessary to write the New York office of Great American for the information. McLean, two days later, called Bartling again and was told that it had been necessary to write to New York and Bartling would send the excerpts as soon as he received them. Shortly thereafter the Houston bank that had agreed to participation in the loan withdrew its request for excerpts of the by-laws and accepted participation on the instruments as submitted. McLean pursued his request to Bohannon and Bartling no further, as the excerpts were not then needed.

The record establishes that Bohannon had placed the Great American bonds in Bartling's hands for delivery in Houston. Bohannon represented, the record shows, that he had in fact executed the bonds for Bartling as the producing agent. When Bartling arrived in Houston to deliver the bonds to McLean, nothing remained to be done with respect to the bonds except make physical delivery. McLean had no reason to believe the bonds were stolen or had been brought to him without authority, since they were made payable to the bank of which McLean was president and in all other respects conformed in every detail to the prior understanding and agreement of the parties to the loan.

Under all the circumstances, Bartling was acting as a messenger sent by Bohannon who as attorney-in-fact for Great American had performed every act necessary in connection with the bonds, save handing them to McLean. Bartling's arrival without power of attorney as a messenger for Bohannon and his coming as a stranger to McLean, when viewed with all the other facts surrounding the one final step of handing over the bonds, is insufficient to support the jury's finding against the great weight of the contrary evidence here mentioned, which we stated more fully in our first consideration of this case. (441 S.W.2d 563–564)

As noted earlier, McLean was not familiar with a loan procedure by which the borrower secured the loan with a surety bond. Circumstances leading up to the transaction caused McLean to have fears of forgery. Commercial Investment and its officers were not known to McLean. Nathan had furnished McLean a financial statement, prepared by a firm of certified public accountants in Los Angeles, showing Commercial Investment to have a net worth of about $11,000,000. But because he was unable to obtain credit information on Commercial Investment, McLean determined he would not make the loan unless adequate security, in the form of bonds, could be furnished the bank.

As already noted, McLean sought and obtained legal advice from the bank's attorney on two occasions, and was assured that such surety bonds were legal in Texas and that the language of the specimen bond, and later the language of the executed bonds, was legally sufficient.

McLean's earlier concern as to whether the agent for execution had authority to write such bonds was removed by his exam-

ination of Bohannon's power of attorney attached to the bonds showing that Great American's highest officers assured all who might read the instrument that Bohannon could be trusted to write any kind of surety bond and without limit on the amount.

In advance of delivery of the bonds, McLean was concerned that the persons from California, whom he had met but did not know well, might bring the bonds for delivery, without opportunity for McLean to ascertain genuineness of the signature of the agent executing the bonds. But the California borrowers did not come with the bonds. Instead Bartling, who claimed to be, and was in fact, a Kansas City local agent for Great American, arrived to deliver the bonds. On examination, the bonds were found to be in due order, as to signature, superimposed by the manually-impressed seal of Great American, as to the notary certificate, and as to recitations that execution was the act and deed of the surety company. The bonds Bartling took to McLean were not in fact forgeries, since they had been signed by Bohannon, as the jury found.

In connection with McLean's fear of forgery, the Supreme Court stated also that McLean "doubted the capacity to act in some respects of those with whom he was dealing." McLean did decline, after the bonds had been delivered and the loan transaction had been completed, to guarantee the endorsement of William Skillman on a cashier's check, made payable to Continental Investment Bankers, Inc. Nathan had purchased the check, and Skillman asked McLean to endorse the check guaranteeing Skillman's endorsement as for Continental. Throughout the loan transaction, Skillman purported to be a broker only, instrumental in bringing together the bond customers and Great American's agents, and had no part in negotiating the loan, or with closing that transaction, or with execution and delivery of the two bonds to secure the loan. Skillman's position was so completely outside the loan transaction itself as to make it understandable why McLean was unwilling to guarantee his endorsement on the cashier's check. McLean's lack of confidence in Skillman, or in Skillman's capacity and authority, if such confidence was lacking, would be entirely apart from McLean's investigation of, and satisfaction with, the apparent authority of Bohannon and his messenger, Bartling.

McLean did not assume, in the absence of evidence, that any person claiming to act as agent in the loan transaction had the authority such person claimed to have. McLean acted upon the power of attorney as to Bohannon's authority, or apparent authority, and upon Bartling's actual possession of the bonds as evidence of his authority to turn them over to McLean.

If McLean was placed upon further inquiry, after examining the bonds which Bartling had brought to him, he was not required to make unlimited investigation, but only such inquiry of the sources of information as would be indicated by the circumstances to a reasonably prudent person; and only to such inquiry, if prosecuted, as would result in knowledge of the fact sought to be imputed. (441 S.W.2d at 564 and cases there cited)

If McLean had further doubt of Bartling's authority to bring the bonds to him, after finding from examination on the bonds that Bohannon was the agent for execution, any additional inquiry under the circumstances would have led back to Bohannon. The logical inquiry of Bohannon would have been: Did you place these bonds in the hands of Bartling, and if you did, for what purpose? The power of attorney recited that Bohannon had power to execute the bonds, which would include authority to deliver.

It is reasonable to suppose that if McLean had so inquired of Bohannon on the day the loan transaction was closed, Bohannon would no more have denied Bartling's authority than he did four days later when he told McLean that Bartling

would have to supply the additional information McLean needed by way of excerpts from the company's by-laws. On the latter date Bohannon did not disavow the bonds, nor did he say Bartling had no authority to deliver the bonds. By every implication Bohannon ratified and approved delivery of the bonds by Bartling and further indicated that Bartling would continue to act in the matter by furnishing the additional information McLean requested.

If McLean had decided to inquire of someone other than Bohannon, it is logical that he would have called Lynn Gregg, since he already knew from the Houston office of Great American that Gregg was regional manager for the company in Kansas City. McLean had also noted from the power of attorney attached to the bonds that Gregg, along with Bohannon, had unlimited authority to execute bonds. As regional manager, Gregg would have been administrative supervisor of both Bohannon and Bartling.

Gregg testified at the trial that he was unfamiliar with operations of the surety bond department of the regional office and did not actually know what powers Bohannon had in bonding matters. Gregg knew that Bohannon was head of the bond department and had been selected by Great American as knowledgeable in the field. It is not reasonable to expect that Gregg, on the day the loan was closed, would have undertaken, if called by McLean, to do more than he did four days later, when McLean called to ask for excerpts from the by-laws. On the latter occasion, Gregg referred the entire matter to Bohannon because, he said, he did not know about bonds and Bohannon did and was the man in charge of such business.

Under such circumstances, it seems apparent that further inquiry by McLean at the time of closing the loan, either by calling Bohannon or by calling Gregg, would have been fruitless insofar as it would have served to prove or disprove Bartling's authority to deliver the bonds. If any-

thing, an inquiry of Bohannon at the time the loan was closed would have confirmed that Bohannon had in fact given the bonds, after executing them, to Bartling for delivery to McLean.

 After mature consideration of the Supreme Court's analysis of the evidence and its holding that there was some evidence to support the jury's finding that Bartling did not have apparent authority to deliver the bonds, we have concluded that the evidence is factually insufficient to support the finding, being so against the great weight and preponderance of the evidence as to be clearly wrong.

For the reasons stated, the judgment of the trial court that plaintiff take nothing as to defendant Great American Insurance Company is reversed, and the cause as to such parties is remanded to the trial court for new trial.

Reversed and remanded.